## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA  DIVISION

| | | |
|---|---|---|
| **CATHY CARTER** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Civil Action File No.** |
| | ) | **1:20-cv-01674-TWT-JSA** |
| | ) | |
| **PAUL HOWARD**, in his | ) | |
| Individual Capacity | ) | |
| *Defendant.* | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT
## OF UNDISPUTED MATERIAL FACTS

COMES NOW Plaintiff Cathy Carter, in the above styled matter, and hereby responds to Defendant Paul Howard's Statement of Undisputed Material Facts as follows:

1. Plaintiff began working for Fulton County in the early 1990s at the Tax Assessors Office.

**Plaintiff's Response**: Disputed as stated inasmuch as the evidence shows that, specifically, Plaintiff Cathy Carter began working in the Fulton County Tax Assessors Office on or about September 25, 1990, not the early 1990s. (Carter Dep. 20:24-25).

2. Plaintiff took orientation which explained the County's sexual harassment policy, which was also the policy used by the DA's Office.

**Plaintiff's Response**: Undisputed.

3. Plaintiff met Howard in the mid-1990s. (Carter Dep. 22:02-08).

**Plaintiff's Response**: Undisputed.

4. From the outset of their relationship, Plaintiff testified that her and Howard would always exchange "a flirty comment here or there."

**Plaintiff's Response**: Disputed because Plaintiff never testified that she and Defendant were in a "relationship" and further, Plaintiff testified that she and Howard "exchanged *numbers*" not flirty comments, as she was about to volunteer to help Mr. Howard's campaign for District Attorney. (Carter Dep. 22:17-24). The evidence also demonstrates that *Mr. Howard* made a "flirty comment here or there," every time Plaintiff saw Defendant. As an example of unsolicited sexual harassment/misconduct Howard even purchased lingerie for Cathy Carter while she was his subordinate employee at the Fulton County District Attorney's Office. (*See* Howard Dep. 59:20-60:01, with Carter Dep. 121:11-19). In support of Ms. Carter's evidence, she has evidence of Marlene Allen, who was another female subordinate of Howard's in the DA's Office,  and who provided a sworn declaration to Plaintiff's counsel in which she swore that "Paul Howard left me lingerie from Victoria's Secret on my work desk when I was working at 136 Prior Street address. He asked me had I seen the package and that he wanted me in the underwear. He told me that was my

Valentine's Day present"; Howard, however, testified that Ms. Allen is being dishonest about this sworn statement. (*See* Howard Dep. 17:20-18:09 and Pl. Ex. 1, Marlene Allen Declaration ¶ 8).

5. Plaintiff worked on Howard's first campaign for district attorney.

**Plaintiff's Response**: Undisputed, but the Court should know for accuracy purposes, the evidence shows that Ms. Carter was not an employee who worked on the Howard campaign; she was a volunteer. (Carter Dep. 23:09-13).

6. In 2000, Plaintiff transferred to the DA's Office as a legal assistant.

**Plaintiff's Response**: Undisputed.

7. Plaintiff was trained on the County's sexual harassment policy, which is used by the DA's Office.

**Plaintiff's Response**: Undisputed.

8. Plaintiff admits she knew the policy.

**Plaintiff's Response**: Undisputed.

9. Plaintiff testified repeatedly that, since she began at the DA's Office in 2000, if she did not give in and have sex with Howard, then "her job was gone." (Carter Dep. 34:12 – 35:02).

**Plaintiff's Response**: Disputed as stated. Defendant's citation does not support his facts. LR 56.1 (B)(2)(a)(2)(iii). The Citation of "Carter Dep. 34:25-35:02" actually shows that Ms. Carter testified that "job was gone" means Howard

would begin to pressure her and if she did not react to said pressure, Howard would punish her. (Carter Dep. 34:25-35:02) Indeed, Carter made this point clear a few lines downward by testifying that "I told him on several occasions, no… Not just then, always. I've always said no. but eventually, I knew I was going to have to give in because he constantly doing me favors for my son and stuff. If not, my job was gone." In this sense, Carter clarified upon questioning exactly what she meant by "my job was gone' by stating "it was either getting written up or someone calling me in the office telling me. I never gotten written up, but somebody— the supervisor, "Cathy, Mr. Howard need to see us down to the office." He put more work on me. He telling me it's not the quality of work that he expected out of me and stuff. But soon as I end up going to bed with Mr. Howard, things calm down." (*See* Dep. Carter 34:25-36:03.) To support this evidentiary assertion against Howard, Ms. Carter has evidence of Marlene Allen, who was another female subordinate of Howard's in the DA's Office. Ms. Allen provided a sworn declaration to Plaintiff's counsel in which she swore that Paul Howard's **routine practice** with her "was to make unsolicited sexual comments and if I [Ms. Allen] rejected his advances, he would make my [Ms. Allen's] job harder and make me feel as if I would lose my job until I played along with his unwanted sexual harassment"; however, Howard states Ms. Allen is being untruthful with this statement. (**Compare** Howard Dep. 21:5-15, **with** Pl. Ex. 1, Marlene Allen Declaration ¶ 11, **with** USCS Fed Rules Evid R 404(B)(2), stating

that "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.")

10. Plaintiff also testified that between the years 2000 and 2011 if she told Howard "no" to sex then she would be "punished." (Carter Dep. 34:25- 36:03.)

**Plaintiff's Response**: Disputed as stated. Plaintiff testified throughout her deposition to a systematic scheme of pressure and punishment. (Carter Dep. 29:01-14, 35:01-12, 52:12-20, 63:11-14,  94:01-02, 112:03-08, 115:09-15, 119:21-25, 122:01-05, 124:11-19, 133:19-134:25, 139:6-15, 141:15-21, 194:18-25, 195:2-5, 195:19-21, 198:18-20 Carter's assertions of Howard's pressure and punishment.) In support of Ms. Carter's evidence here, she has evidence of Marlene Allen, who was another female subordinate of Howard's in the DA's Office. Ms. Allen provided a sworn declaration to Plaintiff's counsel in which she swore that Paul Howard's **routine practice** with her "was to make unsolicited sexual comments and if I [Ms. Allen] rejected his advances, he would make my [Ms. Allen's] job harder and make me feel as if I would lose my job until I played along with his unwanted sexual harassment"; however, Howard states Ms. Allen is being untruthful with this statement. (**Compare** Howard Dep. 21:5-15, **with** Pl. Ex. 1, Marlene Allen Declaration ¶ 11, **with** USCS Fed Rules Evid R 404(B)(2), stating that "evidence

may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.")

11. Plaintiff testified that she refused sex with Howard between when she began in 2000 through 2005 or 2006. (Carter Dep. 42:08-42:19).

**Plaintiff's Response**: Disputed as stated. Notably, and foremost **is a fact of serious significance**: Defendant Paul Howard testified under oath that he never had sex with Ms. Carter **or any other subordinate** employee while he was the Fulton County District Attorney. (*See* Howard Dep. 59:05-19, 61:01-25.) And **contrary** to refusing sex through 2005 or 2006, the evidence shows that Ms. Carter actually "gave in" and had sex with Defendant in his office after Howard helped her son with his criminal problems sometime in 2005 or 2006. (Carter Dep. 30:04-25.)

12. Although Plaintiff alleges her refusal to have sex with Howard would mean losing her job or being punished, in 2004, during the period she contends that she refused to sleep with Howard, Plaintiff was promoted to the Major Case Division. (Carter Dep. 43:02-17).

**Plaintiff's Response**: Disputed as stated. Disputed, Plaintiff objects pursuant to L.R. 56.1 (b)(2)(a)(2)(ii) because the evidence is grossly incomplete, and therefore inaccurate.  As such, Ms. Carter offers the following evidence, which "in fairness ought to be considered at the same time" (*See* USCS Fed Rules Evid R 106) because it demonstrates that (1) the promotion was because Ms. Carter told Howard

she needed to make more money; (2) the promotion came during countless sexual overtures; (3) after the promotion, Howard stepped up his harassment; and  (4) after getting the promotion and Howard helping her son, Howard pushed for sex stronger and Ms. Carter gave in:

"Q.    Okay. And so in 2004, you started with Major Case?

A.    That's correct.

Q.    Was that a promotion?

A.    It was a promotion.

Q.    Okay. Were you getting paid more than before?

A.    Yes. **And what happened was I told Mr. Howard I couldn't -- I needed more money**. And he came up with a solution for me to go to Major Case cause the young lady that was in Major Case was going to Cold Case. And he didn't have anyone else to fill that position and he put me in that position.

Q.    Okay. And you felt you were qualified for that position?

A.    More than qualified for that position."

(Carter Depo 43:02-17.)

And the Court should consider the following testimony in terms of Howard's conduct after he promoted Ms. Carter to the Major Case Division:

A.    Major Case, I was the office manager as well as supervising the paralegals.

Q.   **And it's during this period that Mr. Howard** was also harassing you?

A.   Yeah. It's not a -- it -- I don't think it was a week or a day go by that Mr. Howard didn't call or say something or ask me can I go to see him in his office. He would just call me in his office, and he would touch --

Q.   And what was --

A.   -- feel on me.

Q.   Sorry. What was your reaction?

A.   I told him on several occasions, no. And I felt like -- I said, "Mr. Howard, these people know you're in here." He said, "I don't care about them people. I -- I'm the -- I'm the boss." (Carter Dep. 33:05-34:11); (**Compare** Carter Dep 38:01-39:04, testifying that she was sexually harassed by Howard from the time she started working in 2000 through 2011 and then from when she started working again until she was terminated, with Carter Dep. 28:06-20, showing Cater was being harassed from 2000 through 2004 prior to the promotion, **with** Carter Dep. 43:02-17, starting in new Major Case promotion/position, **with** Carter Dep 40:22- 42:05, Carter testifying about being pressured for sex even more **after** Howard helping her son, with Howard Dep. 78:21-79:01, admitting to having conversations with sexual overtones between 2000 and 2011, although the parties disagree on the frequency.)

Plaintiff further objects pursuant to L.R. 56.1 (b)(2)(a)(2)(ii) because the evidence is grossly incomplete, and therefore inaccurate. (*See* USCS Fed Rules Evid

R 106.) As stated above, the testimony unambiguously clarified what was meant by losing my job; Carter testified that losing her job means Howard would begin to pressure her and if she did not react to said pressure, Howard would punish her, thereby placing her in constate fear of losing her job. (*See* Carter Dep. 34:25-35:02.) Indeed, Carter made this point clear a few lines downward by testifying that "I told him on several occasions, no… Not just then, always. I've always said no. but eventually, I knew I was going to have to give in because he constantly doing me favors for my son and stuff. If not, my job was gone." In this sense, Carter clarified upon questioning exactly what she meant by "my job was gone' by stating "it was either getting written up or someone calling me in the office telling me. I never gotten written up, but somebody – the supervisor, "Cathy, Mr. Howard need to see us down to the office." He put more work on me. He telling me it's not the quality of work that he expected out of me and stuff. But soon as I end up going to bed with Mr. Howard, things calm down," thereby placing Carter in constant fear of losing her job. (*See* Carter Dep. 34:25-36:03.)

Moreover, Howard's sexual harassment/misconduct that began as soon as she began working for Howard, stating "it was a constant thing from the first time [she] met Mr. Howard." Indeed, although Howard and Ms. Carter disagree on how often he made statements with sexual overtones from January 1, 2000, until Ms. Carter retired in 2011, Howard does admit under oath, he made statements with sexual

overtones to her, 'often.' (Howard Dep. 78:21-79:01). Relevantly, Howard promoted Ms. Carter and thereafter Ms. Carter gave in and had sex with Howard in the DA's private office in the Fulton County Courthouse, **after she was promoted**. (Carter Dep. 38:01-25; 42:02-17).

13. Plaintiff's promotion to the Major Case Division came with a pay raise.

**Plaintiff's Response**: Undisputed.

14. Plaintiff believed that she earned the position on merit and that she "was more than qualified."

**Plaintiff's Response**: Disputed, Plaintiff objects pursuant to L.R. 56.1 (b)(2)(a)(2)(ii) because the evidence is grossly incomplete, and therefore inaccurate. As such, Ms. Carter offers the following evidence, which "in fairness ought to be considered at the same time" (*See* USCS Fed Rules Evid R 106) because it demonstrates that (1) the promotion was because Ms. Carter told Howard she needed to make more money; (2) the promotion came during countless sexual overtures; (3) after the promotion, Howard stepped up his harassment; and  (4) after getting the promotion and Howard helping her son, Howard pushed for sex stronger and Ms. Carter gave in:

"Q.    Okay. And so in 2004, you started with Major Case?

A.    That's correct.

Q.    Was that a promotion?

A.   It was a promotion.

Q.   Okay. Were you getting paid more than before?

A.   Yes. **And what happened was I told Mr. Howard I couldn't -- I needed more money**. And he came up with a solution for me to go to Major Case cause the young lady that was in Major Case was going to Cold Case. And he didn't have anyone else to fill that position and he put me in that position.

Q.   Okay. And you felt you were qualified for that position?

A.   More than qualified for that position."

(Carter Depo 43:02-17.)

And the Court should consider the following testimony in terms of Howard's conduct after he promoted Ms. Carter to the Major Case Division:

A.   Major Case, I was the office manager as well as supervising the paralegals.

Q.   **And it's during this period that Mr. Howard** was also harassing you?

A.   Yeah. It's not a -- it -- I don't think it was a week or a day go by that Mr. Howard didn't call or say something or ask me can I go to see him in his office. He would just call me in his office, and he would touch --

Q.   And what was --

A.   -- feel on me.

Q.   Sorry. What was your reaction?

A.     I told him on several occasions, no. And I felt like -- I said, "Mr. Howard, these people know you're in here." He said, "I don't care about them people. I -- I'm the -- I'm the boss." (Carter Dep. 33:05-34:11); (**Compare** Carter Dep 38:01-39:04, testifying that she was sexually harassed by Howard from the time she started working in 2000 through 2011 and then from when she started working again until she was terminated, with Carter Dep. 28:06-20, showing Cater was being harassed from 2000 through 2004 prior to the promotion, **with** Carter Dep. 43:02-17, starting in new Major Case promotion/position, **with** Carter Dep 40:22- 42:05, Carter testifying about being pressured for sex even more **after** Howard helping her son, with Howard Dep. 78:21-79:01, admitting to having conversations with sexual overtones between 2000 and 2011, although the parties disagree on the frequency.)

15. During this timeframe, Plaintiff testified that she "always told him no [to sex]." Yet, she never lost her job, was never punished, and never had any tangible employment action taken against her.

**Plaintiff's Response**: Disputed. Foremost, Plaintiff does not know exactly which time frame Defendant is referring to but assumes the timeframe from 2000-2004. Second, Plaintiff objects to the extent that tangible employment action is referencing the legal doctrine of adverse employment action. To the extent that tangible employment action is not referencing adverse employment action the evidence demonstrates although Plaintiff said no to "sex"  in this timeframe (2000-

2004), she did indeed experience punishment in the form described above such as either getting written up or someone calling me in the office telling me. I never gotten written up, but somebody – the supervisor, "Cathy, Mr. Howard need to see us down to the office." He put more work on me. He telling me it's not the quality of work that he expected out of me and stuff. But soon as I end up going to bed with Mr. Howard, things calm down," thereby placing Carter in constant fear of losing her job. (*See* Carter Dep. 34:25-36:03.)

Moreover, Howard was sexually harassing Carter at the time he gave her the promotion and helped her son, and after that—as a matter of fact—the evidence demonstrates he put even more pressure on Ms. Carter for sex and she relented, having sex with him in his office. (Carter Dep. 28:03-20, 29:1-04, 35:01-12, 52:12-20, 63:11-14,  94:01-02, 112:03-08, 115:09-15, 119:21-25, 122:01-05, 124:11-19, 133:19-134:25, 139:6-15, 141:15-21, 194:18-25, 195:2-5, 195:19-21, 198:18-20 Carter's assertions of Howard's pressure and punishment).

Lastly, if the time frame extends through 2011, then Carter also received punishment (and according to Defendant himself, "tangible employment action [*See*, infra, para. 21]) in the form of being put on administrative leave, which she testified only happened because she had been rejecting Howard's sexual advances/misconduct as she prepared up for retirement.  (Carter Dep. 52:21-53:24, 63:15-64:02.)

16. Plaintiff testified that she first had sex with Howard in 2005 or 2006 because he helped with her son. Plaintiff testified that after Howard helped her son with a criminal charge in Clayton County, she relented and had sex. Plaintiff testified that "[she] knew [she] was going to have to give in because he constantly doing me favors for my son and stuff." (Carter Dep. 34:12-16, 35:09-12, 42:11-15).

**Plaintiff's Response**: Undisputed.

17. Plaintiff claimed that she told Howard no to sex many times between 2000 and 2011 but could not give an example of any tangible "punishment." She was never written up, demoted, or terminated by Howard, nor did she have any adverse employment actions taken against her.

**Plaintiff's Response**: Disputed. Plaintiff objects to the extent that tangible employment action is referencing the legal doctrine of adverse employment action. To the extent that tangible employment action is not referencing adverse employment action the evidence demonstrates that Ms. Carter did experience tangible "real" employment action that threatened her job, because Howard would routinely take away special privileges, he afforded her. For example, in 2004, Howard would hold a meeting stating that Ms. Carter's "job performance was not to his expectation" or he would track her attendance more closely **in response to her not acquiescing to Howard's sexual harassment/advances**. Or as stated above "it was either getting written up or someone calling me in the office telling me. I never

gotten written up, but somebody – the supervisor, "Cathy, Mr. Howard need to see us down to the office." He put more work on me. He telling me it's not the quality of work that he expected out of me and stuff. But soon as I end up going to bed with Mr. Howard, things calm down," thereby placing Carter in constant fear of losing her job. (Carter Dep. 28:03-29:04, 35:01-36:03, 36:23-37:07, 52:21-24, 63:11-14, 92:18-25, 108:5-21, 109:06-114:09, 115:7-15).

In support of Ms. Carter's evidence, Marlene Allen in her declaration swore that "Paul Howard never had a problem with me being a late to work or taking off work whenever I wanted to until I would try to avoid him and refuse to accompany him to outside business function. When that happened, suddenly I would be required to a sign in sheet demonstrating what time I arrived to work and he would begin to harass me by piling on job tasks that were actually unrelated to my normal job duties"; however, Paul Howard testified that Ms. Allen is being dishonest about this statement and thus he denied everything. (*See* Howard Dep. 18:11-19:15 and Pl. Ex. 1, Decl. Marlene Allen, ¶ 9); (*see* USCS Fed Rules Evid R 404(B)(2), stating that "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.")

18. Plaintiff was suspended for 10 days in 2011 after she tried to physically attack an assistant district attorney, Linda Dunikoski. (Carter Dep. 46:17-50:24).

**Plaintiff's Response**: Foremost, Plaintiff objects on the grounds that it is immaterial to the 2019 termination because Howard never mentions this as a reason for terminating Ms. Carter. (*See* Howard Dep. 93:01-06, explaining what Howard used to determine Carter's termination); (*see* LR 56.1 (B)(2)(a)(2)(iii).)

Ms. Carter testified that she was suspended both after and because she began rejecting Mr. Howard, refusing to have sex with him and avoiding him, as to avoid his sexual overtures; moreover, the Court should note that Ms. Carter testified under oath that Dunikoski threatened her: "[S]he called me the N-word and pointed her finger at my face. And that's what started the confrontation with me and her." (Carter Dep. 52:21-53:24, 47:07-17, 63:15-64:02.)

19. When asked if she threatened Dunikoski with violence, Plaintiff testified, "Oh yeah. I told her I was going to whoop her ass" and she intended to, "[l]iterally hit her, yeah." (Carter Dep. 49:06-49:21).

**Plaintiff's Response**: Foremost, Plaintiff object on the grounds that it is immaterial to the 2019 termination because Howard never mentions this as a reason for terminating Ms. Carter. (*See* Howard Dep.  93:01-06, explaining what Howard used to determine Carter's termination); (*see* LR 56.1 (B)(2)(a)(2)(iii).)

Also, the Court should note that Ms. Carter testified under oath that Dunikoski threatened her. "[S]he called me the N-word and pointed her finger at my face. And that's what started the confrontation with me and her." (Carter Dep. 47:07-17.)

20. Plaintiff testified that she was restrained by an investigator "maybe an inch before I hit her." (Id.).

**Plaintiff's Response**: Foremost, Plaintiff objects on the grounds that it is immaterial to the 2019 termination because Howard never mentions this as a reason for terminating Ms. Carter. (*See* Howard Dep. 93:01-06, explaining what Howard used to determine Carter's termination); (*see* LR 56.1 (B)(2)(a)(2)(iii).)

Also, the Court should note that Ms. Carter testified under oath that Dunikoski threatened her. "[S]he called me the N-word and pointed her finger at my face. And that's what started the confrontation with me and her." (Carter Dep. 47:07-17).

21. Between 2000 and 2011, Plaintiff's only allegation of a tangible employment action for refusing to have sex with Howard is the suspension for the incident with Dunikoski. Plaintiff testified that it is her belief that she was not suspended for using violence or for being restrained to stop the attack; rather, "the only reason why Mr. Howard suspended [her]" was that she refused to have sex with him. (Carter Dep. 52:21-53:24, 63:15-64:02).

**Plaintiff's Response**: Disputed. Plaintiff objects to the extent that tangible employment action is referencing the legal doctrine of adverse employment action. To the extent that tangible employment action is not referencing adverse employment action the evidence demonstrates that Ms. Carter did experience tangible "real" employment action that threatened her job, because Howard would

routinely take away special privileges, he afforded her. For example, in 2004, Howard would hold a meeting stating that Ms. Carter's "job performance was not to his expectation" or he would track her attendance more closely **in response to her not acquiescing to Howard's sexual harassment/advances**. Or as stated above "it was either getting written up or someone calling me in the office telling me. I never gotten written up, but somebody – the supervisor, "Cathy, Mr. Howard need to see us down to the office." He put more work on me. He telling me it's not the quality of work that he expected out of me and stuff. But soon as I end up going to bed with Mr. Howard, things calm down," thereby placing Carter in constant fear of losing her job. (Carter Dep. 28:03-29:04, 35:01-36:03, 36:23-37:07, 52:21-24, 63:11-14, 92:18-25, 108:5-21, 109:06-114:09, 115:7-15).

In support of Ms. Carter's evidence, Marlene Allen in her declaration swore that "Paul Howard never had a problem with me being a late to work or taking off work whenever I wanted to until I would try to avoid him and refuse to accompany him to outside business function. When that happened, suddenly I would be required to a sign in sheet demonstrating what time I arrived to work and he would begin to harass me by piling on job tasks that were actually unrelated to my normal job duties"; however, Paul Howard testified that Ms. Allen is being dishonest about this statement and thus he denied everything. (*See* Howard Dep. 18:11-19:15 and Pl. Ex. 1, ¶ 9); (*see* USCS Fed Rules Evid R 404(B)(2), stating that "evidence may be

admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.")

22. Plaintiff retired from the DA's Office on January 24, 2012, to help care for her ailing mother. (Exhibit 3, retirement personnel action form).

**Plaintiff's Response**: Disputed. Foremost, Plaintiff objects pursuant to LR 56.1 (B)(2)(a)(2)(iii) on the grounds that the proffered citation does not support the Defendant's fact, *to wit* the Exhibit cited does not state Ms. Carter retired  "to help care for her ailing mother," and there is no other evidence cited by defendant to support this asserted fact. Second, Plaintiff objects pursuant to LR 56.1 (b)(2)(a)(2)(ii) because the evidence does not state *why* Ms. Carter retired in 2011. And third, Plaintiff objects and refutes Defendant's fact, pursuant to LR 56.1 (B)(2)(a)(2)(i) on the grounds that the Defendant's own evidence is not factual, *to wit,* the Exhibit cited states Ms. Carter retired in 2011, but the Defendants' fact in number 22 states Ms. Carter "retired from the DA's Office on January 24, 2012." (*See* LR 56.1 (B)(2)(a)(2) (i) (i)(iii).

23. Between 2012 and late 2014, while she was not working for the DA's Office, she continued to talk to Howard on the phone "all the time" and continued to have phone sex with him. (Carter Dep. 57:11-58:07).

**Plaintiff's Response**: Disputed as stated. The evidence shows that it was Paul Howard who initiated these calls. In fact, to put this in proper context for the Court, what Ms. Carter actually testified to was:

> *"Q. Okay. So during 2012 to 2014, were you in contact with Mr. Howard?*
>
> *A. All the time. Mr. Howard did not stop calling me. I would be riding down the highway. Mr. Howard would call me making sure that he – "Make sure you don't give away Cathy -- my pussy while you're down there in Mississippi. Tell them boys that's my stuff."* (Carter Dep. 57:11-18).

24. Plaintiff testified that Howard continued to be a friend while she was retired. Asked if she and Howard would engage in flirtation, she replied, "Oh. Yeah, I did." (Carter Dep. 62:18-20).

**Plaintiff's Response**: Disputed as stated. The evidence shows that it was Paul Howard who initiated these calls. In fact, to put this in proper context for the Court, what Ms. Carter actually testified to was:

> *"Q. Would you engage in flirtation -- flirtation with him?*
>
> *A. Oh. Yeah, I did.*
>
> *Q. Okay.*
>
> *A. On the phone cause he would ask me different kinds of questions and stuff like that "Cathy, what are you wearing? Make sure you don't -- tell them guys that*

*you are not they property down there." I used to tell him, "That's not the kind of*

*party. I'm only going down here from my mother being ill."*

*Q. So it was sort of a playful thing?*

*A. You -- he'd say, "You better save my pussy until you -- till I get some and*

*don't give it to nobody else."*

*Q. Okay. And --*

*A. And I would laugh, kind of jokey, jokey and laugh it off. But if I was working*

*for him and he said that, it'd been a whole different thing.*

*Q. Okay. And how would it have been different?*

*Because sooner or later, I was going to end up having to give in. If I didn't*

*give in, there was punishment."* (Carter Dep. 62:18-63:14).

25. Plaintiff testified that when Howard would make comments that he wanted
to have sexual relations with her, "I would laugh, kind of jokey, jokey and laugh it
off…" (Carter Dep. 62:09 – 63:06).

**Plaintiff's Response**: Disputed as stated. First, Plaintiff objects pursuant to
LR 56.1 (B)(2)(a)(2)(ii) because the evidence is grossly incomplete, and therefore
inaccurate. (*See* USCS Fed Rules Evid R 106.) Foremost, this conversation occurred
while Ms. Carter **was retired** and what she said was in response to Howard saying
"Cathy, what are you wearing? Make sure you don't – tell them guys that you are
not they property down there… you better save my pussy until you – till I get some

and don't give it to nobody else"—Ms. Carter stated "[a]nd I would laugh, kind of jokey, jokey and laugh it off. But if I was working for him and he said that, it's been a whole different thing." (*See* Carter Dep. 62:18-63:10); (Carter Dep. 62:18-63:14, 28:03-20, 29:01-04, 35:01-12, 52:12-20, 94:01-02, 112:03-08, 115:09-15, 119:21-25, 122:01-05, 124:11-19, 133:19-134:25, 139:6-15, 141:15-21, 194:18-25, 195:2-5, 195:19-21, 198:18-20 Carter's assertions of Howard's system of pressure and punishment).

26. Plaintiff was re-hired by the DA's Office on March 12, 2014, as a Mobile Outreach Coordinator (MOC), which was a position funded by Fulton County. The MOC would visit crime victims and help get them services and provide support. (Carter Dep. 64:03-06).

**Plaintiff's Response**: Undisputed.

27. While Plaintiff was a MOC, an investigator that visited victims with her, Mr. Carmack, began recording Plaintiff's conversations with victims that were inappropriate. (Exhibit 12, excerpts of a deposition where Plaintiff testified about the recordings).

**Plaintiff's Response**: Disputed. First, Plaintiff objects pursuant to LR 56.1 (B)(2)(a)(2)(iii)  because the alleged recording is immaterial and has not been admitted or offered into evidence by Defendant, and thus it would be violation of the best evidence rule to consider such transcript. Second, Ms. Carter objects

pursuant to 56.1 (B)(2)(a)(2)(ii) and as such, offer the following evidence, which "in fairness ought to be considered at the same time" (*See* USCS Fed Rules Evid R 106). In that vein, Ms. Carter testified to the following:

A. I don't even remember that. But I can tell you this. Every conversation that was on this tape that Carmack tape, I've never been disciplined for it. Mr. Howard never written me up. No supervisor written me up. And whereas it was after the process of being at -- it's just communicating with the people that I went out to -- victim for.

(Carter Dep. 175:12-18). Third, and again, Ms. Carter objects pursuant to LR 56.1 (B)(2)(a)(2)(iii) because this information is immaterial and because there is no evidence that Howard took any termination action against Ms. Carter because of the statements allegedly made in the recording. His testimony is the exact opposite. (*See* Howard Dep. 93:01-06, explaining what Howard used to determine Ms. Carter's termination); (*see also* LR 56.1 (B)(2)(a)(2)(iii).)

Fourth, Plaintiff objects based on LR 56.1(B)(1)(c) and *see* LR 56.1 (B)(2)(a)(2)(iii) because the movant's citation does not support his fact inasmuch as the citation does not even reference Defendant Howard actually believing that Ms. Carter behaved "inappropriate"; instead Howard's counsel claims Ms. Carter's conduct was "inappropriate," and in that vein, Howard's counsel has violated LR 56.1(B)(1)(c) by stating his personal opinion as an issue.

28. In one recording, Plaintiff tells a victim who is a lesbian that her mother should be ashamed of her dating a girl, that being a lesbian would make her son "date

another man," that her girlfriend was "manly" so she must be "confused," and that she "need[s] some counseling for real about this." (Id.).

**Plaintiff's Response**: Disputed. First, Plaintiff objects pursuant to LR 56.1 (B)(2)(a)(2)(iii)  because the alleged recording is immaterial and has not been admitted or offered into evidence by Defendant, and thus it would be violation of the best evidence rule to consider such transcript. Second, Ms. Carter's object pursuant to 56.1 (B)(2)(a)(2)(ii) and as such, offer the following evidence, which "in fairness ought to be considered at the same time" (*See* USCS Fed Rules Evid R 106). In that vein, Ms. Carter testified to the following:

> B. I don't even remember that. But I can tell you this. Every conversation that was on this tape that Carmack tape, I've never been disciplined for it. Mr. Howard never written me up. No supervisor written me up. And whereas it was after the process of being at -- it's just communicating with the people that I went out to -- victim for.

(Carter Dep. 175:12-18). Third, and again, Ms. Carter objects pursuant to LR 56.1 (B)(2)(a)(2)(iii) because this information is immaterial and because there is no evidence that Howard took any termination action against Ms. Carter because of the statements allegedly made in the recording. His testimony is the exact opposite. (*See* Howard Dep. 93:01-06, explaining what Howard used to determine Carter's termination); (*see* LR 56.1 (B)(2)(a)(2)(iii).)

29. Plaintiff testified that the conversation with the lesbian victim was appropriate and that there was nothing wrong with the manner that she spoke to the victim. (Carter Dep. 73:23 – 82:20).

**Plaintiff's Response**: Disputed. First, Plaintiff objects pursuant to LR 56.1 (B)(2)(a)(2)(iii)  because the alleged recording is immaterial and has not been admitted or offered into evidence by Defendant, and thus it would be violation of the best evidence rule to consider such transcript. Second, Ms. Carter's object pursuant to 56.1 (B)(2)(a)(2)(ii) and as such, offer the following evidence, which "in fairness ought to be considered at the same time" (*See* USCS Fed Rules Evid R 106). In that vein, Ms. Carter testified to the following:

> C. I don't even remember that. But I can tell you this. Every conversation that was on this tape that Carmack tape, I've never been disciplined for it. Mr. Howard never written me up. No supervisor written me up. And whereas it was after the process of being at -- it's just communicating with the people that I went out to -- victim for.

(Carter Dep. 175:12-18). Third, and again, Ms. Carter objects pursuant to LR 56.1 (B)(2)(a)(2)(iii) because this information is immaterial and because there is no evidence that Howard took any termination action against Ms. Carter because of the statements allegedly made in the recording. His testimony is the exact opposite. (*See* Howard Dep.  93:01-06, explaining what Howard used to determine Carter's termination); (*see* LR 56.1 (B)(2)(a)(2)(iii).)

30. In a second recorded conversation, Plaintiff tells a female victim that she is "a madam," that the "[the victim] can bring me some good money in. I know you can…Hell yea," that "we going to get the money," and that "[d]ollar signs make your eyes get bigger, bigger, bigger." (Exhibit 12).

**Plaintiff's Response**:  Disputed. First, Plaintiff objects pursuant to LR 56.1 (B)(2)(a)(2)(iii)   because the alleged recording is immaterial and has not been admitted or offered into evidence by Defendant, and thus it would be violation of the best evidence rule to consider such transcript. Second, Ms. Carter's object pursuant to 56.1 (B)(2)(a)(2)(ii) and as such, offer the following evidence, which "in fairness ought to be considered at the same time" (*See* USCS Fed Rules Evid R 106). In that vein, Ms. Carter testified to the following:

> D. I don't even remember that. But I can tell you this. Every conversation that was on this tape that Carmack tape, I've never been disciplined for it. Mr. Howard never written me up. No supervisor written me up. And whereas it was after the process of being at -- it's just communicating with the people that I went out to -- victim for.

(Carter Dep. 175:12-18). Third, and again, Ms. Carter objects pursuant to LR 56.1 (B)(2)(a)(2)(iii) because this information is immaterial and because there is no evidence that Howard took any termination action against Ms. Carter because of the statements allegedly made in the recording. His testimony is the exact opposite. (*See* Howard Dep.  93:01-06, explaining what Howard used to determine Carter's termination); (*see* LR 56.1 (B)(2)(a)(2)(iii).)

31. Plaintiff testified that the conversation with the female victim, where she discussed the victim working as a prostitute for Plaintiff, was appropriate. (Carter Dep. 171:21 – 179:12).

**Plaintiff's Response**: Disputed. First, Plaintiff objects pursuant to LR 56.1 (B)(2)(a)(2)(iii)  because the alleged recording is immaterial and has not been admitted or offered into evidence by Defendant, and thus it would be violation of the best evidence rule to consider such transcript. Second, Ms. Carter's object pursuant to 56.1 (B)(2)(a)(2)(ii) and as such, offer the following evidence, which "in fairness ought to be considered at the same time" (*See* USCS Fed Rules Evid R 106). In that vein, Ms. Carter testified to the following:

> E.    I don't even remember that. But I can tell you this. Every conversation that was on this tape that Carmack tape, I've never been disciplined for it. Mr. Howard never written me up. No supervisor written me up. And whereas it was after the process of being at -- it's just communicating with the people that I went out to -- victim for.

(Carter Dep. 175:12-18). Third, and again, Ms. Carter objects pursuant to LR 56.1 (B)(2)(a)(2)(iii) because this information is immaterial and because there is no evidence that Howard took any termination action against Ms. Carter because of the statements allegedly made in the recording. His testimony is the exact opposite. (*See* Howard Dep.  93:01-06, explaining what Howard used to determine Carter's termination); (*see* LR 56.1 (B)(2)(a)(2)(iii).)

32. About a year later, in November 2015, Plaintiff retired from the MOC to take another job with the DA's Office, but where she would be a state employee rather than a county employee. Her new job title was Supervisor of Records. (Exhibit 13; Carter Dep. 67:04-18).

**Plaintiff's Response**: Disputed as stated inasmuch as the supervisor of records position was *funded* by the State of Georgia, but the person in the post (Ms. Carter) directly reported to the District Attorney, Defendant Paul Howard, and her new office was just steps away from the Defendant's office in the Fulton County Courthouse. (Carter Dep. 85:06-23).

33. Plaintiff wrote a retirement letter to Mr. Howard before taking the job with the state. (Exhibit 13, Retirement letter to Howard.)

**Plaintiff's Response**: Objection. Plaintiff objects to this statement pursuant to both 56.1(B)(2)(a)(2)(iii) as immaterial, and  56.1(B)(2)(a)(2)(ii) and as such offers Ms. Carter's testimony, as evidence "that in fairness ought to be considered at the same time" USCS Fed Rules Evid R 106, for a fuller context regarding the retirement letter, which was proffered as a requirement for Ms. Carter to formally separate from the County in order to assume the supervisor of records position *funded* by the State of Georgia. Moreover, it was still the discretion of the Defendant as to *where* Ms. Carter would be physically located, and the evidence shows that

Howard placed Ms. Carter in an office just down the hall from Howard's office. (Carter Dep. 85:06-23).

34. When Plaintiff returned to the DA's Office after her retirement, she was trained again on the sexual harassment policy for Fulton County and the State of Georgia. (Exhibit 14, form showing that Plaintiff was trained on sexual harassment policy signed by her).

**Plaintiff's Response**: Plaintiff objects to this pursuant to 56.1(B)(2)(a)(2)(iii) as immaterial.

35. The Fulton County policy states: "Employees do not have to report discrimination to their immediate supervisor or go through their supervisory chain of command before notifying the DCRC1. In fact, employees are specifically authorized to bypass their supervisors (and chain of command) and report the incident directly to the DCRC." (Exhibit 2, Fulton County Sexual Harassment Policy).

**Plaintiff's Response**: Disputed. Plaintiff objects to this pursuant to 56.1(B)(2)(a)(2)(iii) on the grounds that it is immaterial. And, Ms. Carter objects to this pursuant to 56.1(B)(2)(a)(2)(ii) and thus offers Section VII of said discrimination policy found within Defendant's ECF 108-5, p. 11, as evidence "that in fairness ought to be considered at the same time" USCS Fed Rules Evid R 106: "Fulton County strictly prohibits retaliation against: 1) any employee or citizen who

opposes any act or practice they perceive to violate this policy." And Ms. Carter offers this language under "Statement of Policy, Personnel Policy, Equal Employment Opportunity and Prejudicial Acts—found within Defendant's ECF 108-5. P. 12: "In addition, any acts or threats of violence, property damage, harassment, intimidation, or other acts designed to infringe upon employees' rights as described by federal anti-discrimination laws or Fulton County Personnel Policies **will not be tolerated**. This policy is designed **to strictly prohibit** all discrimination and harassment, including sexual harassment, by or against supervisory officials, employees, non-employees, as well as clients and customers."  USCS Fed Rules Evid R 106.

36. The DA's Office uses Fulton County's policies and procedures for sexual harassment. The policies are available to employees 24/7 on the Fulton County website2. Plaintiff admits that she knew the policies. (Exhibit 2, Fulton County Sexual Harassment Policies; Carter Dep. 29:05-17).

**Plaintiff's Response**: Undisputed.

37. Plaintiff had access to the State's sexual harassment policy which is available 24/7 on the website for Georgia employees. Like the County's policy, the State's policy permits an employee to bypass her supervisors and report directly to the State's Office of the Inspector General. (Exhibit 16, Georgia's State Government Sexual Harassment Policy).

**Plaintiff's Response**: Disputed. Plaintiff objects to this pursuant to 56.1(B)(2)(a)(2)(iii) on the grounds that it is immaterial. And, Ms. Carter objects to this pursuant to 56.1(B)(2)(a)(2)(ii) and thus offers Section II of said "Statewide Sexual Harassment Prevention Policy," ECF 108-19, p. 1, which "in fairness ought to be considered at the same time" USCS Fed Rules Evid R 106:

> "The State of Georgia promotes respect and dignity and does not tolerate sexual harassment in the workplace. The State is committed to providing a workplace and environment free from sexual harassment for its employees and for all persons who interact with state government. All State of Georgia employees and contractors (including subcontractors) are expected and required to interact with all persons including other employees, contractors, and customers in a professional manner that contributes to a respectful work environment free from sexual harassment.
>
> **This Policy is intended to set standards for Executive Branch agencies and employees in furtherance of this commitment and to protect individuals from sexual harassment and retaliation**."

Ms. Carter also offer as evidence Section VI of this Statewide Sexual Harassment Policy, ECF 108-19, p. 3, titled Prohibited Conduct, which "in fairness ought to be considered at the same time" USCS Fed Rules Evid R 106:

> "While sexual harassment encompasses a wide range of conduct, some examples of conduct specifically prohibited by this Policy include, but are not limited to:
>
> 1.    Denying (directly or indirectly) an employment benefit or employment-related opportunity to an employee for refusing to comply with a sexually oriented request;

2.    Threatening (directly or indirectly) to deny an employment benefit or an employment-related opportunity to an employee for refusing to comply with asexually-oriented request;

3.    Providing or promising (directly or indirectly) to provide an employment benefit or employment-related opportunity to an employee in exchange for complying with a sexually-oriented request;

4.    Engaging in sexually-explicit or suggestive physical contact, including touching another employee in a way that is unwelcome or restricting an employee's movement"

38. A complaint using the County or the State's sexual harassment reporting procedure triggers an investigation. (Exhibits 2, 16).

**Plaintiff's Response**: Disputed. Plaintiff objects to this pursuant to 56.1(B)(2)(a)(2)(iii) on the grounds that it is immaterial.

39. Plaintiff filed for Chapter 7 bankruptcy on September 3, 2015. (Exhibit 5, Bankruptcy Petition for Bankruptcy Case No. 15-67109-wlh, Northern District of Georgia (page 1 of 48)).

**Plaintiff's Response**: Disputed. Plaintiff's objects pursuant to LR 56.1 (B)(1)(c) because this assertion—regarding knowledge of bankruptcy laws—has been made "stated as an issue or legal conclusion." Plaintiff objects pursuant to LR 56.1 (B)(2)(a)(2)(iii) on the grounds that it is immaterial because there is no evidence to support that Howard took any termination action against Ms. Carter because of her petition for bankruptcy protection or that the sexual harassment allegations in

this case are related to her Bankruptcy. (*See* Howard Dep. 93:01-06 (explaining what Howard used to determine Ms. Carter's termination), and Carter Dep. 142:10-143:02 and LR 56.1 (B)(2)(a)(2)(iii).)

40. Plaintiff's bankruptcy was discharged on December 24, 2015. (Exhibit 6, Order discharging bankruptcy).

**Plaintiff's Response**: Disputed. Plaintiff's objects pursuant to LR 56.1 (B)(1)(c) because this assertion—regarding knowledge of bankruptcy laws—has been made "stated as an issue or legal conclusion." Plaintiff objects pursuant to 56.1(B)(2)(a)(2)(iii) on the grounds that this proffered evidence is immaterial because there is no evidence to support that Howard took any termination action against Ms. Carter because of her petition for bankruptcy protection or that the sexual harassment allegations in this case are related to her Bankruptcy. (*See* Howard Dep. 93:1-6 (explaining what Howard used to determine Ms. Carter's termination), and Carter Dep. 142:10-143:02 and LR 56.1(B)(2)(a)(2)(iii).)

41. Plaintiff never disclosed to the bankruptcy trustee or the bankruptcy court that she had a legal cause of action that existed against the DA for sexual harassment. (*See* Carter Dep. 142:10-143:02).

**Plaintiff's Response**: Disputed. Plaintiff's objects pursuant to LR 56.1 (B)(1)(c) because this assertion—regarding knowledge of bankruptcy laws and their requirements/mandates—has been "stated as an issue or legal conclusion." Plaintiff

objects to this proffered evidence pursuant to LR 56.1 (B)(2)(a)(2)(ii) because as Defendant pointed out, Ms. Carter's Bankruptcy was discharged in 2015, and thus at the time she filled out her Bankruptcy Paperwork she did not have the cause of action that forms the basis of this lawsuit which is the termination of her employment in 2019. Ms. Carter merely uses sexual harassment by Howard that dates back to 2015 and beyond to support her allegation in this case.  Plaintiff further objects pursuant to 56.1 (B)(2)(a)(2)(iii) on the grounds that this proffered evidence is immaterial, noting that there is no evidence to support that Howard took any termination action against Ms. Carter because of her petition for bankruptcy protection or that the sexual harassment allegations in this case are related to her Bankruptcy. (*See* Howard Dep. 93:01-06 (explaining what Howard used to determine Ms. Carter's termination); (*see* Carter Dep. 142:10-143:02.)

42. Plaintiff testified that she had consensual sex with Howard. Plaintiff later contradicted herself and testified that the sex was not consensual. This occurred after a break in the deposition. (Carter Dep. 44:05-10, 94:07-25).

**Plaintiff's Response**: Disputed. Plaintiff objects to the proffered evidence pursuant to 56.1(B)(2)(a)(2)(iii) because Ms. Carter simply never admitted to sex being consensual with Howard. Specifically, Ms. Carter stated

A. I just told you. He called me to his office.

Q. Okay.

A. And he tried -- and then **I tried to tell him no and stop**. But he kept on

doing  it. For long, my clothes one of -- either my skirt or either my dress was

off, took off my panties, and we had sex in his office on that couch.

Q. Okay. **Are you contending that it wasn't consensual**?

A. I'm not saying it wasn't consensual. **But I'm also saying that if I didn't,**

**there was consequences**. And I knew that because that's what -- that's the

way he operate.

As seen, Ms. Carter **never** said "she had consensual sex" with Howard. That is made

even more evident by Ms. Carter's objection pursuant to 56.1(B)(2)(a)(ii), as she

offers into evidence the portion of her deposition, which "in fairness ought to be

considered at the same time," clarifying her statement "I'm not saying it wasn't

consensual," in the context of staying she tried to tell Howard "no and stop" and "for

long, my clothes one of—either my skirt or either my dress was off…." Specifically,

Ms. Carter testified:

Q. "Okay. All right. So I think in there you said, prior to 2011, you had sex
    with Mr. Howard twice?

A. Yes.

 Q. Okay. And the incident you -- you just spoke of a few minutes ago, was

that consensual?

A. Never been consensual with him, period. I did it because I know I was

going to lose my job. I didn't have anywhere else to go or turn to. If I didn't,

Mr. Howard would punish me. He continued to pressure me. And as a woman -- maybe you don't understand and you've not been in my position and you might be judging me right now -- I did it, what I had to do to save my job and a person who would be able to help me and my son.

Q. Okay. So looking at your complaint, you never alleged that you had unconsensual sex with Mr. Howard.

A. I never said it was consensual either.

Q. Okay. I believe you did testify that it was consensual earlier today, Ms. Carter.

A. I never said it was -- I never consensually had anything. I let Mr. Howard do what he had to do. But I can tell you one thing, if it was consensual -- you're a man. You can feel the difference. He asked me this: "Why don't you ever have a orgasm when we have sex?" Do that let you know that I didn't want to be there? I didn't want to do that."

Also, Foremost, Howard claims that while District Attorney,  he never had sex with Ms. Carter. (Howard Dep. 59:05-19, 61:01-25).

43.  When Plaintiff was asked what she meant by the phrase "it wasn't consensual," she testified that it meant if she did not give in to demands of having sex, Mr. Howard would not do things for her or for her family. (Carter Dep. 194:21-25).

**Plaintiff's Response**: Disputed as stated. First, Plaintiff objects pursuant to LR 56.1 (B)(2)(a)(2)(ii) because the evidence is grossly incomplete, and therefore inaccurate. (*See* USCS Fed Rules Evid R 106.) As such, Ms. Carter offers the following portions of her deposition, which "in fairness ought to be considered at the same time":

> "Q. Is it part of your -- is it your contention in this lawsuit that Mr. Howard raped you?
>
> A. I don't say rape. It wasn't consensual.
>
> Q. What do you mean by, "It wasn't consensual?"
>
> A. When I say consensual, it had -- if anything that Mr. Howard did for me or for my family or anything, if I did not give in to his demands of having sex, I felt like I would be punished.
>
> Q. Uh-huh. Okay. So --
>
> A. And I was punished. On -- there's been numerous of time that he did that and I stopped and then next thing you know, somebody calling me in the office or telling me I'm not doing my job."

(Carter Dep. 194:18-195:05.) As seen and without argument, Ms. Carter clariid yet again what she mean by "it wasn't consensual," this time in the context of **whether she was alleging Howard raped her.**

44. Plaintiff claims that she had sex with Howard between 2016 and 2018 at least 30 times. (Carter Dep. 123:22-124:07).

**Plaintiff's Response**: Disputed as stated. Plaintiff objects pursuant to LR 56.1 (B)(2)(a)(2)(ii) because the evidence is grossly incomplete, and therefore inaccurate. (*See* USCS Fed Rules Evid R 106.) As such, Ms. Carter offers her additional testimony and that testimony of Howard as well relative to this topic, which "in fairness ought to be considered at the same time." First, this Court should note that, although Ms. Carter said its fair to say that she had sex with Howard approximately 30 times between 2016 and 2018, Howard testified under oath he **never** had sex with Ms. Carter **even one time** while he, Howard, was District Attorney, which includes the time period 2016-2018. That established, after testifying that she, Carter, had sex with Howard, between 2016 and 2018, approximately 30 times, she went on to say the following:

"Q. Would you say it was at least 30?

A. Yeah.

Q. And so would you maintain any flirtatious demeanor with him during this period?

A. I guess I really hadn't explained this to you. Mr. Howard works like this. If I entertain Mr. Howard and his conversations, Mr. -- he would be fine. If I stopped, I knew there was going to be some kind of punishment coming from

him. It's either I'm not doing my job or when he calls me to the office. And if

I did do it to this day, if I continue having them conversations and stuff, I still

would have my job today. When I stopped and cut everything off, that's the

reason why I lost my job."

(Carter Dep. 124:06-19).

45. Plaintiff and Howard texted each other often between 2014 and 2019 with
flirtatious, sexually charged messages. (Exhibits 7-10).

**Plaintiff's Response**: Disputed. Plaintiff objects pursuant to LR 56.1

(B)(2)(a)(2)(iii) because the movant's citation does not support the movant's

asserted fact that the text messages referenced to as Defendant's Exhibits 7-10

demonstrate "often" flirtatious, sexually charged messages. (*See* ECFs 108-10

through 108-13.) Moreover, Plaintiff objects because Defendant violated LR 56.1

(B) by failing to point the Court and Ms. Carter to a pinpoint page reference

regarding these **alleged**, numerous sexually charged text messages.   That

established, Ms. Carter re-iterates her objection pursuant to LR 56.1 (B)(2)(a)(2)(iii)

because based on her counsel's review of these text messages, the statements that

seem flirtatious and sexually charged are initiated by Howard such as "You ok.

Cleaning Keyboard," which Carter states was referencing Howard masturbating on

his keyboard, and then cleaning it off, with respect to phone sex Howard requested

of Ms. Carter. (*See* Carter Dep. 135:15-25.) Also, one statement can seemingly be

attributed to Ms. Carter, "No, I need to talk to you now, before I use ny [sic] toy I got," which refers to a sex toy Howard asked Ms. Carter to purchase for phone sex. These are two sexually charged statements, that require talking to one of the participants to gain proper context, **found within 23 condensed pages of text**. (*See* ECFs 108-10 through 108-13.)

46. In July 2014, Plaintiff texted Howard to invite him to her home with her family, "…I have family coming in tomorrow but you are welcome to come over after I get off." (Exhibit 9).

**Plaintiff's Response**: To save time, Ms. Carter incorporates the objections made above I her response to # 45 and its citation with respect to Defendant' failure to provide a pinpoint page citation, thus forcing the Court and Ms. Carter to read over 20 pages of condensed text to determine the accuracy of Defendant's factual assertion.

47. On March 20, 2015, Plaintiff texted Howard, "How are you? I didn't hear back from you last night to tell me how things went." (Id.).

**Plaintiff's Response**: To save time, Ms. Carter incorporates the objections made above I her response to # 45 and its citation with respect to Defendant' failure to provide a pinpoint page citation, thus forcing the Court and Ms. Carter to read over 20 pages of condensed text to determine the accuracy of Defendant's factual assertion.

48. On April 2, 2015, Plaintiff texted Howard, "So will I see you today." (Id.).

**Plaintiff's Response**: To save time, Ms. Carter incorporates the objections made above I her response to # 45 and its citation with respect to Defendant' failure to provide a pinpoint page citation, thus forcing the Court and Ms. Carter to read over 20 pages of condensed text to determine the accuracy of Defendant's factual assertion.

49. On May 27, 2016, Plaintiff texted Howard, "Why didn't I hear from you to let me know when your flight got in." (Exhibit 7).

**Plaintiff's Response**: To save time, Ms. Carter incorporates the objections made above I her response to # 45 and its citation with respect to Defendant' failure to provide a pinpoint page citation, thus forcing the Court and Ms. Carter to read over 20 pages of condensed text to determine the accuracy of Defendant's factual assertion.

50. On June 6, 2016, Plaintiff texted Howard, "Good morning. I know you aren't feeling well now for you to be out of the office this long. Do you need anything? What can I do to make you feel better? I miss you!" (Id.).

**Plaintiff's Response**: To save time, Ms. Carter incorporates the objections made above I her response to # 45 and its citation with respect to Defendant' failure to provide a pinpoint page citation, thus forcing the Court and Ms. Carter to read

over 20 pages of condensed text to determine the accuracy of Defendant's factual assertion.

51. On June 22, 2015, Plaintiff texted Howard, "You not talking to me." (Exhibit 9).

**Plaintiff's Response**: To save time, Ms. Carter incorporates the objections made above I her response to # 45 and its citation with respect to Defendant' failure to provide a pinpoint page citation, thus forcing the Court and Ms. Carter to read over 20 pages of condensed text to determine the accuracy of Defendant's factual assertion.

52. On July 18, 2016, Plaintiff's jealousy over Howard was displayed:

> "I was sitting here in the office thinking about you. For you to always asking me to go somewhere you NEVER, say I'm going to make arrangements for me to get there. When you know financially I'm not able to do things like I once was and even if I was I think if I have a friend and wants me to be with him he would make sure that I get there. This really let me know how much you want to be with me and care for me. I haven't heard from you since you gotten there so I guess you made other arrangements for someone else."
> (Exhibit 8).

**Plaintiff's Response**: Disputed. Ms. Carter objects pursuant to LR 56.1 (B)(c) because Defendant's reference to the cited words of Ms. Carter as indicating "jealousy over Howard" demonstrates that Defendant violated said local rule by stating this alleged jealousy over Howard as "an issue." *See* LR 56.1 (B)(c), stating

"[t]he Court will not consider any fact:… (c) stated as an issue or legal conclusion…."

53. On July 27, 2015, Plaintiff texts Howard at 10:11 PM to say, "No, I need to talk to you now, before I use [my] toy I got." This message was about an adult toy. (Exhibit 9).

**Plaintiff's Response**: Undisputed as Plaintiff already addressed this issue in her response to #45 above.

54. On September 24, 2015, Plaintiff and Howard shared the following exchange:

> Plaintiff: "Just like you said, you are always busy and it hurt my feelings when you tell me when I call you can't talk. That's why I am
> trying my best to get in to you."
> Howard: "You are already into me."
> Plaintiff: "You know sitting watching Scandal make me think of you and I."
> Howard: "You are better looking than Olivia."
> Plaintiff: "And you know he has nothing on you."
> (Id.).

**Plaintiff's Response**: Undisputed.

55. On November 2, 2015, at 9:04 PM, Plaintiff texted Howard, "Hi Just checking to see if you are okay. I didn't hear back from you last night. I hope all is well with you." (Id.).

**Plaintiff's Response**: Undisputed.

56. On June 19, 2016, Plaintiff and Howard had the following text conversation:

Plaintiff: "…How have your father's day been?"
Howard: "Still thinking about your call from yesterday…"
Plaintiff: "Really, so do that mean I will see you tomorrow?"
Howard: "Yes."
Plaintiff: "Is that a promise?"
Howard: "Yes"
(Exhibit 10).

**Plaintiff's Response**: Undisputed.

57. Plaintiff's mother passed away in 2017, with whom she was very close. (Carter Dep. 125:18-20, 126:20-22).

**Plaintiff's Response**: Undisputed.

58. Plaintiff testified that if Howard had given her as much time off from work as she wanted in order to grieve her mother's death, she would not have filed the lawsuit. Plaintiff testified, "That's why we're here today. Mr. Howard never gave me any time to grieve." (Carter Dep.125:21 – 126:19).

**Plaintiff's Response**: Disputed. First, Plaintiff objects pursuant to LR 56.1 (B)(2)(a)(2)(ii) because the evidence is grossly incomplete, and therefore inaccurate. (*See* USCS Fed Rules Evid R 106.) The evidence shows that the answer Defendant posits in its number 58, *supra*, is part of an extended question-and-answer. Consequently, pursuant to Ms. Carter's objection she proffers the following evidence, which "in fairness ought to be considered at the same time."

Ms. Carter starts off her response to the question with the phrase "that's why we're here today." That is not the answer; it is just the *preamble* to her answer. *To*

*wit*, the actual answer to the question in the deposition of Ms. Carter on this issue is several lines later in the response, thus:

"**Q**. *Okay. So when you say it's the reason we're here today, if he had given you time off --*

**A**. *No. If I had played into his hand and continued conversating with him and having sex with him, we wouldn't be here.*" (Carter Dep. 126:23 – 127:02).

59. When asked, "So when you say that we – that's the reason we're here today is because of…" Plaintiff answered, "Grievance. I never had a chance to grieve…" (Id.).

**Plaintiff's Response**: Disputed. Ms. Cater incorporates the same objection as #58 above to save the Court's time, objecting pursuant to LR 56.1 (B)(2)(a)(2)(ii) because the evidence is grossly incomplete, and therefore inaccurate. (*See* USCS Fed Rules Evid R 106.) Ms. Carter explained fully that if she had continued to fall victim to Paul Howard's schemes, by giving him sex and not rejecting him, she would never have filed a Complaint. (Carter Dep. 126:23-127:02.)

60. In fact, after Plaintiff's mother passed away, between January 2017 and March 2018, she took 536 hours (67 workdays) of paid leave and at least another 20 days of unpaid leave. (Exhibit 4, letter concerning Plaintiff's leave accrual).

**Plaintiff's Response**: Undisputed.

61. Plaintiff exhausted her available paid leave, and her medical provider would only certify that she needed 20 days of medical leave. (Id.; 130:01-21).

**Plaintiff's Response**: Disputed as stated inasmuch as Defendant ignored the medical provider's recommendation that Ms. Carter take 20 days of medical leave to recover from emotional stress from the death of her mother. In fact, the evidence shows that Paul Howard directed Plaintiff to get a doctor's recommendation and note if she needed leave and when it was proffered, he demanded she report back to work immediately the next day anyhow. (Carter Dep. 128:5-17, 130:01-131:19).

62. Thus, Plaintiff was angry that Howard would not provide her leave beyond her entitlement under the state's leave policy, which Howard had no control over. (Howard Declaration ¶¶ 3-5).

**Plaintiff's Response**: Disputed. Ms. Carter objects pursuant to LR 56.1 (B)(c) because Defendant's reference to the cited words of Ms. Carter as indicating that she allegedly was  "was angry" demonstrates that Defendant violated said local rule by stating this alleged anger as "an issue." *See* LR 56.1 (B)(c), stating "[t]he Court will not consider any fact:… (c) stated as an issue or legal conclusion…."  Plaintiff further objects pursuant to LR 56.1 (B)(2)(a)(2)(ii) and as such, offers the following evidence, which "in fairness ought to be considered at the same time." In the context of Ms. Carter expressing her feeling about Howard permitting her to go see her mother as much as she wanted, Carter testified to the following:

A. Mr. Howard was -- I could tell he -- I know Mr. Howard. He flip-flop. With me even going to see my mother, that man did not care. He just still wanted me to sleep with him.

"Q. Okay. And you said that him letting you go see your mother at all was **special treatment**?

A. **As may times as I went, yes, sir**.

Q. But you think him not allowing you to go was punishment?

A. It would have been.

Q. Sorry. It would have been?

A. Yes. To the utmost when it come down to my mother at that time because I was **still talking on the phone with him, sex talk**. **I had to do that**. I had to talk to him. If I didn't, I'd be punished. **So that's what I had to do in order to get this time off to spend time with my mother**. **Then he come backs and take it back after I stopped talking with him and cut him off**."

(Carter Dep. 133:15-134:08.)

63. Plaintiff admits that she was chronically absent and tardy during late 2018 and 2019. (Carter Dep. 143:03-144:04, 153:08-13).

**Plaintiff's Response**: Disputed. Plaintiff objects to this proffered evidence pursuant to LR 56.1 (B)(2)(a)(2)(ii) and as such, offers the following evidence,

which "in fairness ought to be considered at the same time." Plaintiff responded to the question "Okay. When did you start coming in late," with her Answer:

A. "I've **always** did **from the first time that I started sleeping with Mr. Howard**. I kind of come up every now and then but not all the time. But during this time with my mother grieving, yes, sir, I came in late.

Q. Okay. And who was your supervisor when you were coming in late?

A. Paul Howard.

Q. Ma'am, who was your supervisor?

A. Paul Howard.

Q. It's your testimony that Paul Howard was your supervisor?

A. Mr. Howard was the supervisor of everything. Ron Dixson said he wasn't even thinking about me. Mr. Howard tell him, "Where's Cathy Carter? Was Cathy on time?" Lynn Nelson -- all his secretary will tell you they wasn't thinking about me. They said Mr. Howard brought it up. I go over and ask Lynn, "You was looking for me?" She said, "No, Mr. Howard were."

Q. Okay. Ron Dixson was your supervisor?

A. Yes.

Q. Was it okay with Mr. Dixson for you to come in late?

A. If I called him, yes. I'd send him a text and let him know what was going on. And I told him, I asked him, "Well, Mr. Howard know I'm grieving?" He knows.

Q. So it was your belief that because Mr. Howard knew you were grieving that you should be allowed to come in late?

A. No, sir. I think he should have allowed me to take some time. **After I stopped talking to him and giving him sex**, he should have allowed me to do as other employees do **and don't punish me for not doing it**.

Q. And that's ultimately what this case is about?

A. Ultimate, that's what it is. He punished me because I stopped talking to him, having sex with him, and **having conversation over the phone about sex**."

(*See* Carter Dep. 138:01-139:15.) Under this same objection, Ms. Carter also offer this testimonial evidence, which "in fairness ought to be considered at the same time":

> THE WITNESS: When I said punishment, I mean this. If I had a conversation with Mr. Howard about what he wants and what his needs were, **I wouldn't have any problem at all at work**. The time that I told him, no, and wouldn't talk to him or anything, I guarantee you three to four days later, I'm being addressed with the supervisor about my work or either I'm called into his office with a group of people saying that I'm not performing my job right. That's what Mr. Howard do.

(*See* Carter Dep. 134:18-135:03); (*see* also Carter Dep. 124:06-19.) Ms. Carter also testified that Howard did not car at all how often she took off work to visit her ill mother out of state so long as she was providing sex talk. (Carter Dep. 133:15-134:8.)

64. Because of her absences, Plaintiff testified she was moved to a new work area, but that she still had the same supervisory job and duties as before. Plaintiff testified that she held her supervisory position until she was terminated, that she was never told that she was no longer a supervisor, and she never received anything from Howard or the Chief of Staff Lynne Nelson saying her job changed. Nor did her compensation change. (Carter Dep. 82:21-83:10).

**Plaintiff's Response**: Disputed. Ms. Carter never testified that she was moved to a new work area because of any "absences." This is made clear though testimonial evidence based on Plaintiff's objection, here, pursuant to LR 56.1 (B)(2)(a)(2)(ii). Plaintiff testified that she was given no reason or information about her being "replaced in [her] office and thrown in a cubicle, transported [her] things without [her] knowledge and everything," and because she was given no reason for this conduct she believed that she must have kept her supervisory status in title only, evident by Ms. Carter's testimony that "[t]o this day, I still haven't gotten anything from Mr. Howard, Lynn Nelson, or anyone saying that I was not a supervisor, and I still kept my pay." (Carter Dep. 83:04-11).

65. Plaintiff recorded a phone call that, according to Plaintiff, occurred on August 24, 2018. In the conversation, Plaintiff and Howard have a graphic sexual discussion. Plaintiff is laughing, joking, and making sexually explicit remarks to

Howard. Howard also engages in this behavior with her. (Exhibit 11, segment of audio recording, filed manually with the Court).

**Plaintiff's Response**: Disputed as stated. Plaintiff objects pursuant to LR 56.1 (B)(1)(c) because whether both Defendant and Plaintiff were joking on this audio has been "stated as an issue in this case," and is a serious issue in this case that must be resolved, as evident by Howard's testimony that his repeated request for Ms. Carter's "pussy," and repeated request to meet for sex, and his other explicit comments heard on the audio, were mere "jokes," and thus should not be taken seriously, is at issue. (*See* ECF 108-14, minute marks16:00-19:00.)

66. For example, on the audio recording Plaintiff makes these comments:

• She laughs and says that she told Howard that "he needed some p*ssy,"

• She laughs loudly as her and Howard discuss "putting things in her mouth,"

• She states that "I truly believe that you need some [p*ssy], I don't know if you getting it but you need some,"

• Plaintiff and Howard continue to converse about "Howard getting some p*ssy," to which Plaintiff asks repeatedly, "when do you want some? When do you want some?"

• Howard asks, "when can you give it to me?" To which Plaintiff replies, "whenever you want some."

• Plaintiff says, "I don't have a boyfriend now. I broke up with the dude I was seeing."

• Howard asks, "why did you break up?" Plaintiff replies, "I was thinking about you too much. And I kept talking about Mr. Howard this, Mr. Howard that."

• Plaintiff tells Howard that "she thought her ex-boyfriend was jealous of you anyway."

• Plaintiff then says to Howard, "I guess I'm all yours now. I'm all yours now."

• Howard asks, "if I call you tomorrow can I come over and get some?" To which Plaintiff replies that her son goes to work around 6 pm. Howard suggests that they could go somewhere else, to which Plaintiff says, "you want to be over here in my bed don't ya?"

• Plaintiff says, since her son works during the evenings, that "we'll just have to meet during the week, when we get off, I'll just meet you and have you a glass of wine."

• Plaintiff then asks Howard, "so what are you doing Sunday evening?" Howard replies that he "thinks he'll be available." Plaintiff then comments, "I think – I think I need some too."

• Plaintiff then ends the call by asking Howard to "call me tomorrow," to

which Howard says "he will."

(Exhibit 11, audio segment).

**Plaintiff's Response**: Disputed as stated. Plaintiff objects pursuant to LR 56.1 (B)(2)(a)(2)(ii) because the evidence is grossly incomplete, and therefore inaccurate. (*See* USCS Fed Rules Evid R 106.)   For example, the Court should consider **the entire recording,** including the following statements:

- **"You act like you dislike me around that office. Nah, i just do that to keep people off of you**." (TC 17:05-17:12)


- "I know you're an attorney, don't be trying to put words in my mouth." (Time Code (TC): 16:12)

- "What did you say I was trying to put in your mouth? ... You trying to put things in my mouth." (TC 16:20)

- "I might have been trying to put something else in your mouth, but not words." (TC 16:28)

- "When are you gonna give me some? Some what? Some pussy." (TC 16:40- 16:52)

- "When you want some? When you want some? When can you give me some? Whenever you want some. **Every time you say that I can't never get you**." (TC 17:23- 17:35)

- "You should have told him [the boyfriend] 'I should be fucking him'..." (TC 18:03)

- "You should have told him [the boyfriend] 'he [Paul Howard] loves to fuck me, he really does' …" (TC 18:22-18:27)

Furthermore, Plaintiff also objects pursuant to LR 56.1 (B)(1)(c) because whether both Defendant and Plaintiff were "joking" on this audio has been "stated as an issue in this case," and is a serious issue in this case that must be resolved, as evident by Howard's testimony that his repeated request for Ms. Carter's "pussy," and repeated request to meet for sex, and his other explicit comments heard on the audio, were mere "jokes," and thus should not be taken seriously, is at issue. (*See* ECF 108-14, minute marks16:00-19:00.)

67. Plaintiff testified that, in 2018 and 2019, she knew Howard would not take any adverse employment action against her if she refused to have sex with him. She told others that "Mr. Howard ain't going to do nothing to me. I said that because I knew what I was doing." (Carter Dep. 121:23-122:20).

**Plaintiff's Response**: Disputed. Foremost Plaintiff objects to this proffered testimony pursuant to pursuant to LR 56.1 (B)(2)(a)(2)(iii) because the movant's assertion does not support the movant's fact. Plaintiff never testified that she "knew Howard would not take any adverse" action against her if she refused to have sex

with him. What the record shows and what Ms. Carter stated under oath was the following:

"Q. Ma'am, you've testified several times today that you were refusing to have sex with Mr. Howard and you were never terminated, were you?

A. **No**. **Because I had sex with him**. **And then when I didn't have sex**, **there was punishment**. Either a supervisor would come and tell me that something I was doing wrong or either I would be called into his office, and he'd say that I'm not doing what I'm supposed to do. I looked Mr. Howard straight in his eyes the whole time that he said that, knowing what he was doing. And I used to tell them and people in that

Complaint Room would tell you this right thing. **I told them Mr. Howard ain't going to do nothing to me**. **I said that because I knew what I was doing**. But I never told nobody that I was sleeping with him because **I was ashamed** of it as a woman and had two sons, so that's the reason why I didn't.

Q. So you never -- you knew he wasn't going to do anything to you?

A. That's what I told them when things come up. I say, "I ain't worried about Mr. Howard." Anybody in  that -- anybody that work for him, could have them -- could have told you that." (*See* Carter Dep. 121:23-122:20.)

This non argumentative fuller picture of the testimony at issue, made pursuant to 56.1 (B)(2)(a)(2)(ii) and USCS Fed Rules Evid R 106, demonstrate that Ms. Carter

never said "she knew Howard would not take any adverse employment action against her if she refused to have sex with him"; to the contrary she told colleagues **"Mr. Howard ain't going to do nothing to me**," and Ms. Carter "**said that because I [Ms. Carter] knew what I was doing [as in having sex with Mr. Howard].**"

68. When asked, "[s]o you knew he wasn't going to do anything to you?" Plaintiff responded, "That's what I told [others] when things come up. I say, 'I ain't worried about Mr. Howard.'" (Carter Dep. 121:23-122:20.)

**Plaintiff's Response**: Disputed. To save this Court's time, Ms. Carter fully incorporates her response to #67 above.

69. Plaintiff never complained about sexual harassment over the 15-16 years that she worked at the DA's Office. (Carter Dep. 194:10-17).

**Plaintiff's Response**: Disputed. Plaintiff did Complain about harassment to her friends. (*See* Exhs. 1, 2.)

70. It was Plaintiff's usual practice to notify her supervisor if anything was happening that she felt was inappropriate. (Carter Dep.73:03-06).

**Plaintiff's Response**: Disputed as stated, inasmuch as Ms. Carter in her testimony stated she would notify supervisors on matters **involving "employees"** and at that time she was referring to employees in the Tax Assessors Office in 1998. (Carter Dep.72:01-73:06). When it came to reporting Howard, Plaintiff stated that

Howard was her boss and reporting him would lead to more punishment. (*See* Carter Dep. 29:01-04, 91:02-07.)

71. Plaintiff testified that she flirted with Howard because it was, "[j]ust humorous and just playing along with Mr. Howard and his little games." (Carter Dep. 204:12-17).

**Plaintiff's Response**: Disputed. Plaintiff objects pursuant to pursuant to 56.1 (B)(2)(a)(2)(ii). Foremost, Plaintiff testified that "sometime[s] there was a flirtatious nature. Additionally, pursuant to Mr. Carter's objection, Plaintiff points the Court to additional testimony which "in fairness ought to be considered at the same time" because it demonstrates the seriousness of the situation Ms. Carter found herself and there was nothing playful about the situation in substance. (Carter Dep. 28:03-20, 29:01-04, 35:01-12, 52:12-20, 63:11-14,  94:01-02, 112:03-08, 115:09-15, 119:21-25,  122:01-05,  124:06-19,  133:15-135:03,  138:01-15,  141:15-21,  194:18-25, 195:02-05, 195:19-21, 198:18-20.)

72. On January 3, 2019, Plaintiff was arrested when she entered the Fulton County Courthouse with a firearm. (Carter Dep. 11:09-15:01).

**Plaintiff's Response**: Undisputed.

73. No action was taken against Plaintiff by Howard or the DA's Office for this arrest. (Carter Dep. 152:08-21).

**Plaintiff's Response**: Undisputed.

74. In April 2019, Plaintiff was given a warning based on her chronic absenteeism and tardiness. Plaintiff was provided with a corrective action plan to complete over a six-month period. The only requirement to complete the plan was to come to work on time. (Carter Dep. 143:03-144:04; 153:08-13; 154:08-155:20).

**Plaintiff's Response**: Disputed. The "corrective action plan" was not over a six-month period; it was 60 workdays. Plaintiff objects pursuant to LR 56.1 (B)(2)(a)(2)(iii), as Defendant's citation does not support his facts. Further, Ms. Carter objects pursuant to 56.1 (B)(2)(a)(2)(ii) and as such, offers the following evidence, which "in fairness ought to be considered at the same time" (*See* USCS Fed Rules Evid R 106). Ms. Carter testified that upon the June gun-charge arrest that she "then called Mr. Howard. Usually, Mr. Howard answered my phone on a minute. Usually, he's return my call. He didn't do any of those, but which I expected anyway because I hadn't been talking to him or doing anything with him. I called Chief Nwokocha. End up Chief Nwokocha was already at the jail when I got there cause we had a case that involved Clayton County Sheriff Department so she was already there. And I went to jail, when I came back, Mr. Howard had boxed up all of my stuff, had an investigator dump it in my garage before even investigating this case to see was I guilty or innocent of." (Carter Dep. 162:18-163:04)

That testimony falls right inline with other testimony that Ms. Carter, in fairness, would like to be considered at the same time. Defendant's counsel asked "Okay. When did you start coming in late," and Ms. Carter answered:

"A. I've **always** did **from the first time that I started sleeping with Mr. Howard**. I kind of come up every now and then but not all the time. But during this time with my mother grieving, yes, sir, I came in late.

Q. Okay. And who was your supervisor when you were coming in late?

A. Paul Howard.

Q. Ma'am, who was your supervisor?

A. Paul Howard.

Q. It's your testimony that Paul Howard was your supervisor?

A. Mr. Howard was the supervisor of everything. Ron Dixson said he wasn't even thinking about me. Mr. Howard tell him, "Where's Cathy Carter? Was Cathy on time?" Lynn Nelson -- all his secretary will tell you they wasn't thinking about me. They said Mr. Howard brought it up. I go over and ask Lynn, "You was looking for me?" She said, "No, Mr. Howard were."

Q. Okay. Ron Dixson was your supervisor?

A. Yes.

Q. Was it okay with Mr. Dixson for you to come in late?

A. If I called him, yes. I'd send him a text and let him know what was going on. And I told him, I asked him, "Well, Mr. Howard know I'm grieving?" He knows.

Q. So it was your belief that because Mr. Howard knew you were grieving that you should be allowed to come in late?

A. No, sir. I think he should have allowed me to take some time. **After I stopped talking to him and giving him sex**, he should have allowed me to do as other employees do **and don't punish me for not doing it**.

Q. And that's ultimately what this case is about?

A. Ultimate, that's what it is. He punished me because I stopped talking to him, having sex with him, and **having conversation over the phone about sex**.

(*See* Carter Dep. 138:01-139:15.) Under this same objection, Ms. Carter also offer this testimonial evidence, which "in fairness ought to be considered at the same time":

> "THE WITNESS: When I said punishment, I mean this. If I had a conversation with Mr. Howard about what he wants and what his needs were, **I wouldn't have any problem at all at work**. The time that I told him, no, and wouldn't talk to him or anything, I guarantee you three to four days later, I'm being addressed with the supervisor about my work or either I'm called into his office with a group of people saying that I'm not performing my job right. That's what Mr. Howard do."

(*See* Carter Dep. 134:18-135:3); (*see* also Carter Dep. 124:06-19.) Ms. Carter also testified that Howard did not care at all how often she took off work to visit her ill mother out of state so long as she was providing sex talk. (Carter Dep. 133:15-

134:08.) Ms. Carter would also like the Court to consider at the same time as considering Defendant's cited testimony, in fairness, the fact that Ms. Carter's testimony of coming and going as she pleased--from the first time that I started sleeping with Mr. Howard—is supported by the sworn declaration of Tisa Grimes, Howard's Director of human Resources/Office Manager, who has swore that when she was HR Director/Office Manager, she "witnessed Cathy Carter have the autonomy to arrive at work and leave at her own accordance," and Howard never disciplined Ms. Carter for this, until April 2019, no matter what type of frustration Howard exemplified—mindful that the audio recording, in this case, demonstrates that Howard would intentionally act frustrated and mad with Ms. Carter at work "to keep people off of you [Cathy Carter]." **Compare** Ex. 2, Declaration of Tisa Grimes, with ECF 108-14, audio recording, minute mark 17:05 to 17:12 "You act like you dislike me around that office. Nah, i just do that to keep people off of you."

75. On June 7, 2019, Howard learned from his Chief Investigator, Cynthia Nwokocha, that Plaintiff had been arrested for aggravated assault with a firearm by the Riverdale Police Department. (Howard Declaration ¶ 6-8).

**Plaintiff's Response**: Disputed. Plaintiff objects based on LR 56.1(B)(c) because the evidence relied on, the incident report, does not support the fact asserted that Ms. Carter was arrested for aggravated assault. In his Declaration, Defendant Paul Howard states on at least two occasions that Ms. Carter was arrested for the

serious felony charge of aggravated assault. The evidence shows that is false. Defendant's own evidence (ECF 108-20, Riverdale Police Dept. Incident Report) demonstrates that Ms. Carter was not arrested for aggravated assault, because the officers on the scene found no immediate serious danger to anyone, and thus she was charged with *simple assault* which is a misdemeanor. "Lt. Webber responded to the scene to assist in the investigation process. Based on the totality, Miss Carter was arrested and charged for Simple Assault …" (*See* ECF 108-20, Riverdale Police Dept. Incident Report, p. 2, ¶4), (Howard Declaration ¶¶ 6-108).

76. Howard had Ms. Nwokocha obtain the Incident Report for the arrest and forward it to him for review. (Howard Declaration ¶ 6-8; Exhibit 17, Incident Report).

**Plaintiff's Response**: Undisputed.

77. The Incident Report states that Plaintiff admitted to the Officer that, at a gas station, she approached a man that she believed owed her $400 "with her weapon in hand not pointing it at him asking him for the cash he owed and promised to return." (Id.).

**Plaintiff's Response**: Undisputed.

78. The victim stated that "he was fearful of his life and he raised both hands up to the sky as she pointed the weapon at his chest." He eventually ran as other

"customers who observed the incident all panicked and hurrily [sic] left the location when the incident occurred." (Id.).

**Plaintiff's Response**: Disputed. Ms. Carter objects pursuant to 56.1 (B)(2)(a)(2)(ii) as there is no proof that this incident report has been authenticated and the subject statement is hearsay.

79. After reviewing the Incident Report, Howard determined that due to the nature of the accusations in the Incident Report, he could not in good conscience allow Plaintiff to remain employed at the DA's Office. Howard also feared that the Office could face liability based on his knowledge of Plaintiff's arrests and history of gun violence if he failed to act. (Howard Declaration ¶¶ 9-12.)

**Plaintiff's Response**: Disputed. Ms. Carter's object pursuant to 56.1 (B)(2)(a)(2)(ii) and as such, offers the following evidence, which "in fairness ought to be considered at the same time" (*See* USCS Fed Rules Evid R 106), which should be considered by the court when determining a triable issue regarding Ms. Carter's termination. (Carter Dep. 167:05-25). (Carter Dep. 162:18-163:04, 138:01-139:15, 134:18-135:3, 124:06-19, 133:15-134:08, 29:01-04, 35:01-12, 52:12-20, 63:11-14, 94:01-02, 112:03-08, 115:09-15, 119:21-25, 122:1-5, 124:11-19, 133:19-134:25, 139:6-15, 141:15-21, 194:18-25, 195:2-5, 195:19-21, 198:18-20, 157:02-06, 145:19-146:25, 134:18-135:3, 124:6-19, 133:15-134:08, 09:19-10:04, 11:09-12:22, 149:07-153:07); (Carter Dep.29:01-04, 35:01-12, 52:12-20, 63:11-14, 94:01-02,

112:03-08, 115:09-15, 119:21-25, 122:1-5, 124:11-19, 133:19-134:25, 139:6-15, 141:15-21, 194:18-25, 195:2-5, 195:19-21, 198:18-20 Carter's assertions of Howard's pressure and punishment.); (ECF 108-20, Riverdale Police Dept. Incident Report; Howard Declaration ¶¶ 6-108); Ex. 3 April, 11, 2019 probation letter; Ex. 2, Declaration of Tisa Grimes.)

Plaintiff further objects pursuant to 56.1 (B)(2)(a)(2)(iii) because the movant's citation does **not** support the movant's assertion that Ms. Carter had a "history of gun violence." The evidence clearly demonstrates that there is no "history of gun violence." In each case mentioned by Defendant, the charges were either dropped or the state found no reason to prosecute. (Carter Dep. 157:02-06). Additional evidence from Ms. Carter's testimony demonstrates again there simply is no "history of gun violence" relative to Plaintiff. *To wit*, the courthouse incident only occurred because the Courthouse had recently invoked stiffer protocols that required an arrest. Previously Ms. Carter, *and several others*, had mistakenly carried their licensed weapons through security, and were routinely allowed to simply take their firearm to their vehicle, which the evidence and the record shows that is exactly what Ms. Carter had done in the past. (Carter Dep. 145:19-146:25).

80. Howard also considered that this was Plaintiff's second arrest for a crime with a handgun in six months and that Plaintiff was already on a corrective action plan for chronic absenteeism and tardiness. (Id.).

**Plaintiff's Response**: Disputed. Foremost, regarding the allegation of "chronic absenteeism and tardiness" Ms. Carter incorporates fully her answer in number 63, citing to Carter Dep. 134:18-135:3, 124:6-19, 133:15-134:08, to save this Court's time.  Plaintiff objects to this proffered evidence pursuant to LR 56.1 (B)(2)(a)(2)(ii) and as such, offers the following evidence, which "in fairness ought to be considered at the same time:" 1) Upon learning of Ms. Carter's January 2019 arrest for taking her firearm into the Courthouse, Howard said he would "take care of it," 2) there was a new "zero policy" put in place regarding carrying weapons into the courthouse that had just went into effect, where previously Carter and others were allowed to simply return their weapons to their vehicles, 3) one of Howard's investigators met Ms. Carter at the jail and a deputy advised that Howard had already placed a call on her behalf, 4) Ms. Carter received an expeditious first-appearance hearing and unlike other arrestees did not have to stay a night in jail before a first appearance in court, 5) Ms. Carter was **not** disciplined by the DA's Office for this incident. (*See* Carter Dep. 09:19-10:04, 11:09-12:22, 149:07-153:07).

Moreover, shortly after Howard aiding Ms. Carter during the January 3, 2019, courthouse arrest, Carter swears that Howard requested sex and she rejected him. (*See* Ex. 4, Declaration of Cathy Carter.) Relevantly, Howard in his sworn testimony does not deny asking Ms. Carter for sex within two weeks of assisting her with this gun issue at the courthouse. (*See* Howard Dep. 91:04-91:11). Notably, at the end of

2018 into the beginning of 2019 Ms. Carter had "stopped completely taking his [Howard's] calls or anything," despite Howard's continual attempts to have sex with Ms. Carter (*see* Carter Dep. 147:21-148:21). Then, in April, Ms. Carter was put on probation for 60 workdays, after having been permitted to be late 47 times to work, with 2 unexcused absences, and with 7 instances where her whereabouts were unknown since Ms. Carter did not sign in, between January 1, 2019, and April 5, 2019; Relevantly, Paul Howard's Director of Human Resources/Office Manager has sworn that "during my time as Human Resources Director/ Office Manager I witnessed Cathy Carter **have the autonomy** to arrive at work and leave at her own accordance." (*See* ECF 108-21, Termination letter); (**Compare** Ex. 3, April 11, 2019, probation letter, with Ex. 2, Declaration of Tisa Grimes.)

81. Based on these factors, Howard made the decision to immediately terminate Plaintiff. He sent her a letter on June 7, 2019, informing her that she was terminated. (Exhibit 18, termination notice).

**Plaintiff's Response**: Disputed. Foremost, regarding the allegation of "chronic absenteeism and tardiness" Ms. Carter incorporates fully her answer in number 63, citing to Carter Dep. 134:18-135:3, 124:6-19, 133:15-134.08. Additionally, to save the Court time, Plaintiff also objects to the proffered evidence pursuant to LR 56.1 (B)(2)(a)(2)(ii) and as such, incorporates fully the evidence in Plaintiff's answer in numbers 74, 75, 79, 80: (Carter Dep. 162:18-163:04, 138:01-

139:15, 134:18-135:3, 124:06-19, 133:15-134:08.); (ECF 108-20, Riverdale Police Dept. Incident Report and Howard Declaration ¶¶ 6-108); (Carter Dep. 157:02-06, 145:19-146:25); and (Carter Dep. 134:18-135:3, 124:6-19, 133:15-134:08, 09:19-10:04, 11:09-12:22, 149:07-153:07, Ex. 4, Declaration of Cathy Carter, Ex. 3, April, 11, 2019 probation letter,  and Ex. 2, Declaration of Tisa Grimes) which "in fairness ought to be considered at the same time."

82. Plaintiff admits that in the 15 to 16 years that she has worked at the DA's Office, she does not know of any employees that were not terminated after being accused of using a firearm in an assault. (Carter Dep. 167:10 -15).

**Plaintiff's Response**: Disputed as stated. First, Plaintiff objects pursuant to LR 56.1 (B)(2)(a)(2)(ii) because the evidence is grossly incomplete, and therefore inaccurate. (*See* USCS Fed Rules Evid R 106 which states "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that *in fairness ought to be considered at the same time*.") (Emphasis added.) As such, Ms. Carter offers the following more-complete portion of her deposition:

"*Q.    Ma'am, you were not fired for bringing a gun to the courthouse, were you?*

*A.     No. So why --*

Q.    Okay.

A.    -- would I get fired for this time?

Q.    Okay. Let me just get my question out. Do you know of any other employees that were not fired after being arrested for using a gun?

A.    No.

Q.    Okay.

A.    Not that I know of.

Q.    Okay. Do you think that it is unreasonable for a district attorney to terminate an employee who is arrested for a gun offense?

A.    Yes, sir. Before an investigation, I do.

Q.    Okay. So you think he needs to investigate?

A.    Due process.

Q.    I'm sorry?

A.    I felt like I needed to due process and he didn't give me that with that arrest.

Q.    Ma'am, what due process?

A.    I think he should have just looked at the picture and seeing exactly what was going on with this right here before he fired me." (Carter Dep. 167:00-168:03)

Secondly, Ms. Carter's testimony further provides demonstrative evidence that Howard's decision to terminate had little to do with the two minor gun-related

incidents in January and June 2019, because while Paul Howard fired Ms. Carter, he terminated no other employees who had been arrested on similar gun offenses. As such, Ms. Carter offers this portion of her deposition, which "in fairness ought to be considered at the same time":

"*Q.   Okay. Okay. So after this second arrest, you were terminated?*

*A.   Yeah. But at the same gun that I had when Mr. Howard helped me, the exact same gun, a little 380 or whatever. But he didn't investigate this or anything. He made up his mind even before I could get out of jail that I was fired.*

*Q.   I understand.*

*A.   Had he -- did he fire everybody else because of a gun? No. That had been arrested, no.*

*Q.   Okay. What other employees had been arrested for using a gun?*

*A.   I told you earlier. Two -- a lady before me that was in his office she used to work in the Complaint Room. Then one of the guys that worked in the Complaint Room with me -- I think it was March or April of the -- 2019, he got arrested for bringing a gun into the County.*" (Carter Dep. 166:09-167-01)

This immediate testimony above is tethered to all of Plaintiff's evidence herein, when taken altogether, provides a clear retrospect of Defendant's actions. For the Court's convenience Mr. Carter now provides these citations *in toto*. What the evidence shows is that any determination of firing Ms. Carter based upon gun

charges, a history of gun violence or chronic absenteeism or tardiness are pretexts for why Paul Howard truly terminated Cathy Carter—her rejections of his unwanted sexual advances and her refusing to be pressured and punished any longer from December 2018 through her termination on June 7, 2019. (Carter Dep. 167:05-25). (Carter Dep. 162:18-163:04, 138:01-139:15, 134:18-135:3, 124:06-19, 133:15-134:08, 29:01-04, 35:01-12, 52:12-20, 63:11-14, 94:01-02, 112:03-08, 115:09-15, 119:21-25, 122:1-5, 124:11-19, 133:19-134:25, 139:6-15, 141:15-21, 194:18-25, 195:2-5, 195:19-21, 198:18-20, 157:02-06, 145:19-146:25, 134:18-135:3, 124:6-19, 133:15-134:08, 09:19-10:04, 11:09-12:22, 149:07-153:07); (Carter Dep.29:01-04, 35:01-12, 52:12-20, 63:11-14, 94:01-02, 112:03-08, 115:09-15, 119:21-25, 122:1-5, 124:11-19, 133:19-134:25, 139:6-15, 141:15-21, 194:18-25, 195:2-5, 195:19-21, 198:18-20 Carter's assertions of Howard's pressure and punishment.); (ECF 108-20, Riverdale Police Dept. Incident Report; Howard Declaration ¶¶ 6-108); Ex. 4, Declaration of Cathy Carter; Ex. 3, April, 11, 2019 probation letter; Ex. 2, Declaration of Tisa Grimes.)

Respectfully submitted this 12th day of December 2022,

/s/Mario B. Williams
Mario B. Williams
Ga. Bar No. 235254

/s/David E. Betts
David E. Betts
Ga. Bar No. 055850

**HDR LLC**
44 Broad Street NW, Suite 200
Atlanta, GA 30303
(404) 254-0442
mwilliams@hdrattorneys.com


**BETTS & ASSOCIATES**
44 Broad Street NW, Suite 200
Atlanta, GA 30303
(404) 254-0442
davidbetts@bettslaw.net

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day PLAINTIFF'S RESPONSE TO DEFENDANTS STATEMENT OF MATERIAL FACTS were sent to all counsel of record via CM/ECF which automatically serves an email notification to all counsel of record.

Respectfully submitted this 12th day of December 2022,

<u>/s/Mario B. Williams</u>
Mario B. Williams
Ga. Bar No. 235254

**HDR LLC**
44 Broad Street NW, Suite 200
Atlanta, GA 30303
(404) 254-0442
mwilliams@hdrattorneys.com