IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CATHY CARTER, | ) | |
| *Plaintiff*, | ) ) ) | |
| v. | ) ) | Civil Action No.: 1:20-cv-01674-TWT-JSA |
| PAUL HOWARD, in his individual and official capacity, | ) ) ) ) | |
| *Defendant*. | ) ) | |

**PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS WHICH THE RESPONDENT CONTENDS ARE MATERIAL AND PRESENT A GENUINE ISSUE FOR TRIAL**

Plaintiff, Ms. Cathy Carter, files her additional facts which the Respondent contends are material and present a genuine issue for trial.

**Additional facts related to Paul only being sexually interested in women**

1. While acting as district attorney Paul never made a sexual advance towards a man. (Howard Dep. p. 108:21-24)

2. Howard states he has never been interested in men sexually. (Howard Dep. p. 108:25-109:02.)

## Additional facts related to whether or not Paul Howard believed consent matters with respect to sexually harassing a subordinate employee

3. Howard admitted under oath that he knows it's inappropriate to touch a subordinate employee's buttocks even if said employee consented to the touching. (Howard Dep. 33:10-15, 33:23-34:03)

4. Howard testified that he was mystified that women believed that they could lose their job if they filed a complaint against him for sexual harassment. (Howard Dep. p. 52:05-11.)

5. Howard admitted also that it is inappropriate for him as District Attorney to make a sexual advance on a subordinate female employee while you were district attorney of Fulton County, but he would not admit that this conduct constitutes an abuse of authority. (Howard Dep. p. 52:21-53:20)

6. Howard essentially testified that the authority that comes with being a district attorney such as the discretion to terminate a subordinate female employees' job did not play a vital role in restraining the district attorney from making a sexual advance upon a subordinate female employee because, in the context of Cathy Carter and Marlene Allen, "if they believe they had received some inappropriate conduct that they had several avenue to pursue it." (Howard Dep. 51:08-25)

7. Howard testified that he is mystified that someone would believe that they could lose their job they filed a complaint against you for sexual harassment. (Howard Dep. p. 52:05-11)

### Facts related to Paul Howard's credibility regarding sexual misconduct/harassment of subordinate female employees

**A. Marlene Allen**

8. Marlene Allen was an employee of the Fulton County District Attorney's Office while Howard was acting District Attorney. (Howard Dep. p. 108:25-109:02.)

9. Howard was Marlene's boss and thus Marlene Allen was subordinate to Howard. (Howard Dep., p. 12:01-13:12)

10. Marlene Allen provided a sworn declaration to Plaintiff's counsel in which she swore that "Paul Howard left me lingerie from Victoria's Secret on my work desk when I was working at 136 Prior Street address. He asked me had I seen the package and that he wanted me in the underwear. He told me that was my Valentine's Day present; Paul Howard, however, testified that Ms. Allen is being dishonest about this sworn statement. (*See* Howard Dep. p. 17:20-18:09)

11. Notably, Paul also purchased lingerie for Cathy Carter while she was a subordinate employee of Howard's at the Fulton County District Attorney's Office. (**Compare** Ex. 1., Declaration of Marlene Allen ¶ 8, **with** Carter Dep, 121:11-19, with Howard Dep. 59:20-60:01, with Ex. 2, photos of lingerie Howard gave for Carter.)

12. Marlene Allen provided a Declaration to Plaintiff's counsel in which she stated that Paul Howard "on too many times to remember… made sexual advances towards me [Marlene] by making unsolicited and unwanted comments about my body parts such as I just want to suck your breast, I want some…"; **Paul Howard testified, however, that Ms. Marlene is being 'untruthful'** about this statement. (*See* Howard Dep. p. 15:01-15);(*See also* Ex. 1, Decl. of Marlene Allen, ¶ 7.)

13. Marlene Allen provided an affidavit to Plaintiff's counsel in which she stated that Paul Howard "on too many times to remember… called me into his office while he was having a meeting and requested me to write on the chalkboard"; **Paul Howard testified, however, that Ms. Marlene is being 'untruthful'** about this statement. (*See* Howard Dep., p. 15:20-16:06); (*See also* Ex 1., ¶ 7)

14. Marleen further swore that when she "would be writing on the chalkboard, I'd occasionally to look at Paul Howard. He would be staring at my buttocks. He usually called me after those meetings and made a sexual comment about my

buttock. Eventually I got so tired of being called into his office… I began refusing to come to his office for that purpose by not answering his call or say that I was out for lunch"; Paul Howard, however, disagreed with this statement as well. (*See* Howard Dep. p. 16:07-16:18); (*See also* Ex 1., ¶ 7)

15. When pressed about making a comment about Marlene's buttock, Howard could not recall, but then changed his testimony on further inquiry, saying that he could say with 100 percent certainty that he did not make a comment about Ms. Allen's buttock (*See* Howard Dep. p. 17:04-16)

16. Marlene Allen provided a sworn declaration to Plaintiff's counsel in which she swore that Paul Howard "tried to give me an unsolicited kiss on my lips and I had to push away from him to avoid him kissing me"; However, Paul Howard testified that Ms. Allen is being untruthful about this statement. (*See* Howard Dep. p. 19:06-24); (*See also* Ex 1., ¶ 10)

17. Marlene Allen provided a sworn declaration to Plaintiff's counsel in which she swore that Paul Howard's routine practice with her "was to make unsolicited sexual comments and if I [Ms. Allen] rejected his advances, he would make my [Ms. Allen's] job harder and make me feel as if I would lose my job until I played along with his unwanted sexual harassment"; however, Howard Ms. Allen is being untruthful with this statement. (*See* Howard Dep. p. 21:05-15)

18. Ms. Allen also alleged that Howard would make unsolicited comments such as I love you; however, Howard says Ms. Allen is being untruthful about that too, in any sexual/relationship manner. (*See* Howard Dep. p. 21:16-25); (*See also* Ex 1., ¶¶ 11, 12.)

19. Marlene Allen provided a sworn declaration to Plaintiff's counsel in which she swore that "Paul Howard's sexual harassment of me was so continuously nonstop bad in the work place that when I had to visit his officer, I would put on a jacket or something to cover up because he would always stare at my chest. And many times even before going to work I would decide what I would wear for that day based on whether I thought I would have to interact with Paul Howard" (Dep Howard, p. 22:8- 23:9.)

**B. Iyana Young**

20. Iyana Young began working for Paul Howard at the Fulton County District Attorney's office in 2016 through Paul Howard leaving office in 2020 (Howard Dep. p. 29:1-30:05.)

21. Gloria Robinson, who is an elderly woman, and also was a long time employee of Paul Howard, swore in a declaration that she saw Paul Howard kissing Iyana Young in a sexual manner at the work place; However, Howard denies ever kissing Iyana Young; but Gloria Robinson gave a sworn declaration stating that she personally saw Howard kissing Iyana Young on

the lips in what she considered a sexual manner; Ms. Robinson during her tenure under Howard, she "saw a lot of what I consider inappropriate behavior by Paul Howard toward women in the Fulton County District Attorney's office, such as touching, saying inappropriate things; however, Howard testified that Ms. Robinson is being untruthful. (Howard Dep. p. 30:06-32:08); *See also* Ex. 3., Declaration of Gloria Robinson); (*see also* Howard Dep. 34:23-35:10)

22. While Howard was District Attorney, he testified that the work performance of his subordinate staff means something to him; relevantly, his subordinate employee, Iyanna Young (who Ms. Robinson swears she saw kissing Paul Howard in a sexual manner) was severely disciplined on November 16, 2018, by Paul Howard's chief of staff, citing a litany of work performance deficiencies, in a letter to Ms. Young—a letter on which Howard was copied. (*See* Howard Dep. p. 37:12-38:18)

23. Pursuant to the November 16, 2018, Howard's chief of staff "define[d] the seriousness of the situation so you [Iyanna] may take immediate corrective correction" by retraining her on each deficient area within 14 days and in addition, Iyanna Young, to monitoring her work performance for a full 6 months, while advising her she could be **subject to "immediate termination**

    **by District Attorney Paul L. Howard, Jr.**" (Howard Dep. p. 39:01-25) (*See* Ex. 3); (*see also* Howard Dep. 56:02-13); Howard Dep. 57:09-25)

24. Howard testified he had no independent recollection about seeing the subject November 16, 2018 letter; however and relevantly, and as a matter of undisputed fact: just 12 days after the November 16, 2018 subject disciplinary letter, Paul Howard (on November 28, 2018) gave Iyana young a promotion and salary increase and importantly: a new position of executive assistant, "report[ing] directly to the District Attorney, Paul Howard, Jr." (Howard Dep. p. 40:21-42:22)

25. Also, included in the November 28, 2018 promotional letter sent to Ms. Young, by Paul Howard, just 12 days after she received the November 16, 2018 serious work deficiency letter from Howard's Chief of Staff, in which she was advised she would be subject to immediate termination—Howard stated that Ms. Young's "work has been outstanding" and that "accordingly, we [Paul Howard] are shifting you to larger responsibilities"; Howard himself admitted it was odd to receive such a statement about outstanding work when Ms. Young was receiving 14 days of retraining and six months of work-performance monitoring subject to immediate termination. (Howard Dep. p. 42:23-44:07); (44:08-46:25)

### C. Tisa Grimes

26. Ms. Grimes has alleged that Paul Howard sexually harassed her from January 1, 2019, through October 2019, then, Howard retaliated against her by stripping her job title and moving her to an entirely different building, inter alia, after she rejected his sexual advances;

27. Tisa Grimes alleges that Howard groped her buttock in May 2019 and that this sexual harassment/misconduct was unsolicited and unwanted. Howard testified that Tisa Grimes is also being untruthful about having her buttocks groped by Howard between the years 2018 and 2019. (Howard Dep. 34:07-13)

### D. Cathy Carter and Howard's credibility, continued

28. Howard denies having sex with Cathy Carter while he was district attorney, but Cathy Carter said she had sex with him on numerous occasions while Howard was district attorney. (Howard Dep. p. 59:5-19, 61:1-25)

29. Howard denied that he told Cathy that he disciplined her to keep people from being suspicious that he and Carter were in a relationship, but audio recorded evidence clear depicts Howard stating (Compare Howard Dep. p. 60:10-18, ECF 108-14, minute mark 17:05-12)

30. Howard has to Ms. Carter's House at 157 Birch Chase, Riverdale, Georgia but denies having sex with her even though Ms. Carter testifies they did have sex at this address. (Compare Howard Dep 61:6-14, with Carter Dep. 119:04-07, 87:18-89:21.)

### Additional facts which support Ms. Carter's Response Motion

31. Regarding Iyana Young, Marlene Allen, and Cathy Carter and Tisa Grimes all worked under Howard from at least 2016-2020, and during this entire time Paul Howard was married. (Howard Dep. 53:21-54:23)

32. Regarding Marlene Allen, and Cathy Carter and Tisa Grimes all were made to go into Howard's office and write on a chalk board, so that Howard, according to these women, could stare at their body. (**Compare** Ex. 1 Marlene Allen Decl. ¶ 7, **with** Ex. 4, Carter Decl. ¶ 7.)

33. Regarding Iyana Young, she avoided multiple service attempts, to the point her father refused to take service on her behalf, so her testimony is unavailable.

34. Howard is heard on an audio recording responding to Ms. Carter's allegation of him being "mean" to her at the office in front of other employees, by telling her that he just does that to keep employees "off of her"; indeed, while suspending Ms. Carter in 2011 and putting her probation in 2019, Howard

never stopped requesting sex from Ms. Carter, and making sexual overtures towards her, during these two-time periods.

35. Howard provided Ms. Carter with special privileges such as going to and from work whenever she pleased, until he felt Ms. Carter was rejecting his sexual advances; in fact, Howard's Director of Human Resources/Office Manager "witnessed Cathy Carter have the autonomy to arrive a work and leave at her own accordance." (See ECF 116-2 Declaration of Tisa Grimes ¶¶ 5-6.)

36. Howard provided Marlene Allen the special privilege of going to and from work whenever she pleased, until he felt Ms. Allen was rejecting his sexual advances. (*See* Ex. 1, Decl. of Marlene Allen ¶ 9.)

37. Carter refused to have a sex at the start in December 2017 due to being exhausted from him and the death of her mother; relevantly she applied for FMLA and Howard was upset about Carter taking FMLA; Howard wrote Carter a letter, letting her know that her sick leave and annual leave had been exhausted so that her FMLA would go unpaid. (**Compare** Howard Dep p. 62:1-63:01, **with** ECF 108-7, leave letter, **with** Carter Dep. 133:15-134:08, 136:23-137:10.)

38. Ms. Carter testified that Howard did not care at all how much leave she took when she was entertaining his sexual advances and having sex with him; relevantly the subject leave letter demonstrates that Carter took a full 228

hours over her allotted sick leave without any discipline by anyone, nor terminated by Howard. (Howard Dep. p. 62:1-22, 64:1-16); (Carter Dep. 133:15-134:08, 136:23-137:10); (ECF 116-2 Decl. of Tisa Grimes ¶¶ 5-6.)

39. On an audio recording Howard can be heard asking Ms. Carter for some "pussy," and when he did ask for this, it was after only with the wrote that letter telling her she had used 536 hours of leave that he supposedly had no knowledge of. (Howard Dep. p. 70.)

40. About two months after Howard stripped Ms. Carter's supervisory skills away and placed her in a hallway, in a cubicle, immediately upon her return from FMLA—Howard is heard on an audio recording he "I **keep** asking you [for your pussy] and you keep playing with me," demonstrating that after Howard put her in the hallway and took Ms. Carter's supervisory skills away, he kept pursuing sex. (**Compare** ECF 108-14, audio recording minute mark, 16:55-17:20, **with** Carter Dep. 82:25-83:11.)

41. Howard testified, when asked about his statement that he keeps asking Ms. Carter for some pussy, that he and Ms. Carter "would often exchange conversations in that manner…," stating that he meant often having conversations that might have had "some sexual overtones." (Howard Dep. 60:04-08, 75:06-12.)

42. Although Howard and Ms. Carter disagree on how often he made statements with sexual overtones from January 1, 2000 until Ms. Carter retired in 2011, Howard does admit under oath, he made statements with sexual overtones to her. (Howard Dep. p. 78:21-79:1.)

43. Although Howard and Ms. Carter disagree on how often he made statements with sexual overtones from January 1, 2015 until Ms. Carter through Ms. Carter's termination in June 2019, Howard does admit under oath, he made statements with sexual overtones to her. (Howard Dep. p. 78:17-20)

44. Howard told Cathy Carter to tell her boyfriend that he likes fucking her pussy, but Howard claims this was a joke. (Howard Dep. p. 81:10-16); (See ECF 108-14, audio recording minute marks, 18:00-30.)

45. Cathy Carter's son Gabriel was in jail, and she testified that after DA Paul Howard aided in his release. Howard then pressured her for sex including asking Ms. Carter for some of "Cathy's pussy," and she ultimately gave in. (Carter Dep. 30:04-25, 41:01-06, 98:09-17-100:15, 108:05-16) (Howard Dep. 94:3-101:12).

46. Howard assisted Ms. Carter in helping her son by obtaining the service of Demone Lee and when Attorney Lee did not want to continue helping Ms. Carter's son on an additional criminal matter because of a no payment situation, Howard called him and got him to continue representing her son for

free. (Compare Howard Dep 105:3-107:17, Ex. 5, Demone Lee Dep 9:20-13:17.)

47. Howard and his counsel tried to deny that Attorney Lee only represented Ms. Carter's son irrespective of a failure-to-pay issue because Howard called and requested that he go forward regardless of the payment issue; but despite Howard and his counsel's representation that Ms. Carter's assertion was untrue, Attorney Lee testified that indeed he did represent Ms. Carter's son because of Mr. Howard's phone call to him. (**Compare** Howard Dep. 106:15-107:15, in which Howard's counsel says "that is absolutely untrue" and Howard says "I hope you wouldn't try to mislead me," **with** Attorney Lee's testimony from 9:20-11:12:

A. Well, **that's a sore spot** because Gabriel Miller signed an engagement, of which he did not pay me fully for. I don't even know -- **I can't even recall if he made a payment, to be honest with you**.

Q. Okay. Tell me to the best of your knowledge referral of Gabriel Miller to you?

A. You said Mr. Carter?

Q. I mean Mr. Howard. Tell me how the conversation you had with Paul Howard, about the referral of Gabriel Miller to you for representation.

A. Sure. He just said, you know, hey, man, we have -- you have a former colleague, Cathy Carter**; her son got in trouble and wanted to see if this is a case that you want to take on, can help out**. I said yes, and I contacted Gabriel Miller. I don't recall -- I see this disposition here. I don't recall this being the case that I represented him for initially. There were a few cases. The case that I remember initially representing him on was a petty theft charge. It may not be petty theft, but it was a theft charge -- theft by shoplifting. This right here was a subsequent case. I do recall this one. This was a subsequent case of which -- because he did not pay me for the first case, the theft case, I really did not want to represent him for the second case. But Cathy Carter kept calling me and basically trying to get me to step in and represent him. And I really did not want to, but I ended up doing it at the urging of some colleagues saying I needed to help out.

Q. Okay. What colleagues urged you to help out?

A. If I recall correctly, my friend Ernest Nesmith and -- he's the only one I can think of, actually, that did.

Q. **Did Paul Howard urge to help out**?

A. **After I refused** Cathy Carter's calls, **eventually he called** me and said, hey, man, if you mind, **could you please help him out one more time**.

Q. **So this is the second case that you didn't want to be involved in**?

A. **That's correct.**

Q. Let me see if I can pull up the first one. **But you ended up representing him on this case that's represented by Plaintiff's Exhibit No. 1**? I'm going to mark this as Plaintiff's Exhibit No. 1.

A. **I did, I did**. Cathy Carter was a handful to the extent that she interfered with my representation of him in this case, yeah. (Plaintiff's Exhibit No. 1 marked.)

BY MR. WILLIAMS:

Q. We're going to get to that. Let me pull up another one. I want to make sure I get a -- do you see that on the shared screen? A. Uh, that's the second case.

Q. That's the second case, okay. Might not have that first petty theft case. It was a petty theft case, right?

A Yeah, Clayton County as well. And I say petty theft. That's me kind of hearkening back to my days as a prosecutor. I believe it was theft by shoplifting.

Q. Okay. Let me ask you this: At any time – **I know you just testified that when you refused to get involved in the second case, Paul actually called and said, hey, man, can you do me a solid and get involved, correct**?

A He didn't say, can you do me a solid. **He said, can you help out**.

Q. Okay. **And then after that you helped her out again**?

A. **That's correct**.

Respectfully submitted this 12th day of December 2022,

/s/Mario B. Williams
Mario B. Williams
Ga. Bar No. 235254

**HDR LLC**
44 Broad Street NW, Suite 200
Atlanta, GA 30303
(404) 254-0442
mwilliams@hdrattorneys.com

/s/David E. Betts
David E. Betts
Ga. Bar No. 055850

**BETTS & ASSOCIATES**
44 Broad Street NW, Suite 200
Atlanta, GA 30303
(404) 254-0442
davidbetts@bettslaw.net

## CERTIFICATE OF SERVICE

I hereby certify that on this day PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS WHICH THE RESPONDENT CONTENDS ARE MATERIAL AND PRESENT A GENUINE ISSUE FOR TRIAL were sent to all counsel of record via CM/ECF which automatically serves an email notification to all counsel of record.

Respectfully submitted this 12th day of December 2022,

/s/Mario B. Williams
Mario B. Williams
Ga. Bar No. 235254

**HDR LLC**
44 Broad Street NW, Suite 200
Atlanta, GA 30303
(404) 254-0442
mwilliams@hdrattorneys.com