# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **CATHY CARTER**, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No.: |
| | ) | 1:20-cv-01674-TWT-JSA |
| | ) | |
| **PAUL HOWARD, in his individual** | ) | |
| **and official capacity,** | ) | |
| | ) | |
| *Defendant*. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT

Plaintiff, Cathy Carter, by and through undersigned counsel, requests that this Court denies Defendant's Amended Motion for Summary Judgment for the following reasons, inter alia:

1.      Defendant Paul Howard, the District Attorney of Fulton County, over the course of two decades used his position of authority as Cathy Carter's "boss" to sexually harass Ms. Carter through a systematic quid pro quo scheme of pressure/punishment/reward, which eventually pressured Ms. Carter into sexual acts with Howard, who maintained an untenable, hostile environment that led to him

terminating Ms. Carter when she cut him off for good.  (See <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807-08, 118 S. Ct. 2275, 2293 (1998); see also <u>Baines v. City of Atlanta</u>, No. 1:19-CV-0279-TWT-JSA, 2020 U.S. Dist. LEXIS 256074, at *13 (N.D. Ga. Mar. 10, 2020 ).

2.      In addition to forcing unwanted sex acts, and constantly asking Ms. Carter to give him some of  that "Cathy pussy," Howard over the course of Carter's tenure created and permeated a hostile work environment on a daily basis by sexually harassing her and multiple other women with unwanted and unwelcomed comments, kissing, constant staring at their body parts, and purchasing unsolicited gifts such as lingerie. And by and through his harassment Paul Howard altered the conditions of the women's workplace and consequently leaving them vulnerable in a sexually objectionable and offensive environment—one that any reasonable person would find to be both hostile and abusive. (See <u>Jones v. Needham</u>, 856 F.3d 1284, 1291 (10th Cir. 2017); see also <u>Bohen v. E. Chi.</u>, 799 F.2d 1180, 1186-87 (7th Cir. 1986).

## **INTRODUCTION**

Foremost, Howard's credibility is at issue because he flat-out stated, incredulously so, that he never had sex with one female, including Ms. Carter, while he was District Attorney of Fulton County. (Additional Statements of Material

Facts [ASMF] ¶ 28; (Plaintiff's Response to Statement of Material Facts [PRSMF] ¶¶ 11,42, 44). Additionally, Howard testified that swore statements about his sexual harassment in the workplace, made by Marlene Allen, Tisa Grimes, and Gloria Robinson were all untrue. (ASMF ¶¶ 12, 13, 16, 17, 18,21, 27); (PRSMF ¶¶ 9,10); *see also* <u>Bohen</u>, 799 F.2d at 1186-87 (reasoning that pattern and practice can be a powerful way of showing that sexual harassment occurred with respect to a specific Plaintiff). So, everyone is lying except Howard, according to him. (ASMF ¶¶ 8-31.) Truth is, a jury could easily determine Howard was a sexual predator in the workplace, creating a miserable, and highly toxic environment—one in which women had to contemplate their dress attire before coming to work—which spanned over 20 years, and negatively affected countless women, including Ms. Carter. (ASMF ¶¶ 8-32); (PRSMF ¶¶ 4, 10, 43); <u>Tolan v. Cotton</u>, 572 U.S. 650, 660 (2014).

For this Court's purposes, inter alia, Howard admitted under oath, that throughout his relationship with Ms. Carter, he made comments with sexual overtures, **often**, such as asking Ms. Cater when she was going to give him some of that "Cathy pussy," but when confronted with this audio recorded statement, and others such as telling her boyfriend that he, Howard, enjoys fucking her, and that he, Howard, keeps asking Ms. Carter for some pussy---Howard testified that these

were all "jokes." But none of this was funny for Ms. Carter, who suffered real retribution the moment Howard felt she rejected his sexual predation. (ASMF ¶¶ 34, 39, 40, 41,42, 43, 45); (PRSMF ¶¶ 12, 23, 25, 66 ).

## STATEMENT OF FACTS

To save this Court's time, Ms. Carter incorporates her additional statement of material facts (ASMF) which creates a genuine dispute for trial, along with her responses to Defendant's Statement of Facts (PRSMF), which also shows genuine disputes for trial.

## SUMMARY JUDGMENT STANDARD

According to the U.S. Supreme Court, "[t]he Seventh Amendment provides that '[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved....'" City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 708 (1999). Devotion to that edict can be seen as far back as the nineteenth century, where "Alexander Hamilton in The Federalist emphasized his loyalty to the jury system in civil cases…." Galloway v. United States, 319 U.S. 372, 397 (1943). Moving from that point to present, the rule of law emphasizes that "genuine disputes are generally resolved by juries in our adversarial system." Tolan, 572 U.S. at 660. No wonder the Supreme Court has made

the standard of review for non-movants so favorable at the summary judgment stage.

Time and again, as in the oft-cited cases Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Supreme Court has re-enforced its belief in the right to a jury trial through its jurisprudence about the standard of review at the summary judgment stage. Summary judgment "is a lethal weapon, and courts must be mindful of its aims and targets and beware of overkill in its use," Brunswick Corp. v. Vineberg, 370 F.2d 605, 612 (5th Cir. 1967) and is truly only appropriate when the evidence before the court establishes that there is no genuine dispute as to any material fact. In other words, "to grant summary judgment the Court must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir.1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir.1990)). Under these circumstances, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).

To determine whether summary judgment is appropriate, the court must view the facts in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir.2013). In making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with ... [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322; United States v. $119,030.00 in U.S. Currency, 955 F. Supp. 2d 569, 575 (W.D. Va. 2013).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323, 106 S.Ct. 2548. If that burden has been met, to survive summary judgment, the non-moving party must then establish the specific material facts in dispute. Matsushita, 475 U.S. at 586–87; Norris v. Excel Indus., Inc., 139 F. Supp. 3d 742, 746– 47 (W.D. Va. 2015), aff'd, 654 F. App'x 588 (4th Cir. 2016).

A mere speck of evidence supporting the nonmovant's position will not suffice. Glynn, 710 F.3d at 213. Rather, the court must be satisfied that the record contains sufficient material evidence that would permit a reasonable jury to find for the nonmovant. Id. See also Scott v. Harris, 550 U.S. 372, 380 (2007). That said, the nonmovant is *not* required to produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Celotex, 477 U.S. at 324. Importantly, *all this should not obscure the fundamental burden carried by the movant*, who must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings are not in dispute, "or else summary judgment will be denied notwithstanding that the non-moving party has introduced no

evidence whatsoever." <u>Brunswick Corp.</u>, 370 F.2d at 611-12; <u>Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.</u>, 669 F.2d 1026,1031 (5th Cir. 1982).

The strength of the summary judgment standard goes beyond the surface of viewing ostensible material facts in the light most favorable to the nonmovant. The power of the standard is found within its requirement that courts to dig deep by (1) viewing all reasonable inferences derived from material facts to the nonmovant favorably and (2) resolving all ambiguities and doubts regarding material, disputed facts to the nonmovant favorably. <u>Celotex</u>, 477 U.S. at 324; <u>Tolan</u>, 134 S. Ct. at 1866; <u>McAirlaids, Inc. v. Kimberly–Clark Corp</u>., 756 F.3d 307, 310 (4th Cir.2014). **For this reason, the nonmovant's testimony must be credited**. <u>Pourmoghani Esfahani v. Gee</u>, 625 F.3d 1313, 1315 (11th Cir. 2010). That said, the Supreme Court has instructed district courts that the making of "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge...." <u>Anderson</u>, 477 U.S. at 255; <u>Celotex</u>, 477 U.S. at 324.

In a similar vein, the Supreme Court has repeatedly emphasized that circumstantial evidence is often more persuasive and powerful than direct evidence. See <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 100 (2003) (stating, "[t]he

reasons for treating circumstantial and direct evidence alike is clear and deep rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'") (Quoting <u>Rogers v. Missouri Pacific R. Co.</u>, 352 U.S. 500, 508, n. 17 (1957)).

<u>**ARGUMENT AND CITATION TO AUTHORITIES**</u>

Ms. Carter endured **classic sexual harassment/misconduct**, in which Paul Howard pressured, punished, and rewarded Ms. Cater, in relation to whether she accepted or rejected his sexual harassment/misconduct, including having actual sex with him. (*See* ASMF ¶ 28 ); (*see also* PRSMF ¶¶ 11, 12, 16, 42, 44, 67). Eventually, Howard laid down the ultimate punishment for "cutting him off," by using an event as pretext to terminate Ms. Carter's employment. (*See* ASMF ¶¶ 38, 40 ); (*see also* PRSMF ¶¶ 72, 73, 74, 75, 79, 80, 82).

I.    **There exists a triable issue on Plaintiff's Sexual Harassment claims**

     **A. LEGAL STANDARD**

Sexual harassment in the form of quid pro quo and hostile work environment are not wholly distinct; both are "shorthand descriptors to delineate different ways in which sexual harassment can occur." <u>Jones</u>, 856 F.3d at 1291. To demonstrate quid pro quo, at that summary judgment stage, the non-movant must prove a triable issue with respect to whether, due to a tangible employment action, a change in the

terns and condition of employment occurred as a result of Ms. Carter refusal to submit to Howard's demands. Id.; see also Baines, 2020 U.S. Dist. LEXIS 256074, at *13 (N.D. Ga. Mar. 10, 2020).

A hostile work environment, however, can be shown without a tangle employment action, so long as the non-movant creates a triable issue as to whether alleged conduct was so 'severe and pervasive' that said conduct effectively altered Ms. Carter's conditions of employment. Id.; Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67; 106 S. Ct. 2399, 2405-06 (1986). Harassing conduct is conduct which "unreasonably interferes with an employee's job performance by creating a hostile, intimidating, or offensive work environment." Baines, 2020 U.S. Dist. LEXIS at *13. Indeed, "a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets." Henson v. Dundee, 682 F. 2d 897, 901-02 (11th Cir. 1982). Moreover, regarding a hostile work environment claim "[t]here is no requirement that an employee subjected to [a pattern of sexual harassment] provide in addition that she has suffered tangible job detriment." Id. Also, while the showing of a pattern and practice of harassing conduct demonstrates "strong evidence supporting a plaintiff's claim that she herself has been the victim of discrimination"; it is not necessary to show that all

women employees are sexually harassed. Harassment of the plaintiff alone because of her sex is enough.*"* <u>Bohen,</u>799 F.2d at 1186-8. (7th Cir. 1986)

Relevantly, in the context of a respondent superior claim for sexual harassment, "when no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule. Civ. Proc. 8(c). <u>Faragher,</u> 524 U.S. at 807-08. This "defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise…." No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

Lastly, and **most applicable to this case and many sexual harassment cases**: "while some testimony may be subject to credibility determinations, such credibility determination are for the fact finder, which in this case is the jury." <u>Strickland v. Norfolk Southern RY</u>, 692 F. 3d 1151, 1160 (11th Cir. 2012). In fact, Eleventh Circuit Court of Appeals "case law recognizes that, even in the absence of collaborative evidence, a plaintiff's own testimony may be sufficient to withstand

summary judgment." *Id*.

> **B.  A triable issue of facts exists as to whether Paul Howard created both a pervasive and hostile work environment for Cathy Carter and a quid pro quo form of harassment**

From 2000 to 2019 (with a three-year break from 2011 through 2014) over a decade of pressure/reward/punishment towards Ms. Carter, and others, demonstrates a triable issue on whether Howard created and continuously effectuated a pervasive and hostile work environment for Ms. Carter (not to mention every woman in his office), and terminated her employment as retribution for refusing to give into him any longer. See <u>Tolan</u>, 572 U.S. at 660.

Prior to working at the Fulton County District Attorney's Office, Howard was making sexually charged comments to Ms. Carter. (*See* PRSMF ¶ 12); see also <u>Strickland v. Norfolk Southern RY</u>, 692 F. 3d at 1160 (reasoning that "while some testimony may be subject to credibility determinations, such credibility determination are for the fact finder, which in this case is the jury.")  Eventually, he hired Ms. Carter as his legal secretary, and the harassment began, with too many comments to even count about Ms. Carter's body parts and requests for sex, from 2000 through 2011, and from 2014 through her termination in 2019. (*See* ASMF ¶¶ 12, 13, 19); *(see* also PRSMF ¶¶ 4, 11, 12, 15, 16, 17, 44, always harassing Ms. Carter in some form.)  In fact, a **material dispute** is at issue between the parties

because Howard, while trying to downplay exceedingly sexually harassing comments, testified that he "often" made comments with 'sexual overtures' to Ms. Carter, and he made this statement in the context of his own audio-recorded comments, such as I keep asking you for pussy and when you going to give me some pussy, and you should have told your boyfriend I love fucking you; consequently, there exist a triable issue as to how "often" Howard made these lude comments about sex and her body parts because Ms. Carter testified that Hoard's sexual harassment happen nonstop and always, at all relevant times. (*See* ASMF ¶¶ 34, 39, 40, 41,42, 43, 44, 45); (*see also* PRSMF ¶¶ 12, 23, 25, 66, 71, citing Carter Dep 28:03-20, "testifying that Howard would always call me on the office phone. Have me come over to his office and he would touch me, feel on me, try to kiss me. **It was always that way**"); (see also Strickland, 692 F. 3d 1151, 1160 (reasoning that "while some testimony may be subject to credibility determinations, such credibility determination are for the fact finder, which in this case is the jury.")

Moreover, Ms. Carter testified that from the first time she began having sex with Howard, he provided **her the special privilege** of going to and from work as she pleased. (ASMF ¶¶ 35, 38, 47); (PRSMF ¶¶ 74); (*see also* PRSMF ¶ 37, citing to the Statewide Sexual Harassment Policy: "This Policy is intended to set standards for Executive Branch agencies and employees in furtherance of this commitment

and to protect individuals from sexual harassment and retaliation. ... **Providing** or promising (directly or indirectly) to provide **an employment benefit or employment-related opportunity to an employee in exchange for complying with a sexually-oriented request**; ...") Ms. Carter's said testimony is corroborated by Tisa Grimes, Howard's then Director of Human Resources/Office Manager, who gave a sworn declaration which stated "I witnessed Cathy Carter have the autonomy to arrive at work and leave at her own accordance." (ASMF ¶ 35); (Grimes Decl, 116-2 ¶ 5.) That established, Ms. Carter lived under the constant threat that if she did not acquiesce to DA Paul Howard's sexual harassment/misconduct, he would (1) take said privilege away and (2) criticize her work performance and place it under strict scrutiny, until she relented to his sexual harassment/misconduct. (PRSMF ¶¶ 74, 10, 82); (Carter Decl ECF 117-4.) In this vein, and as a matter sworn to fact, Marlene Allen stated that so long as she did not reject Howard's sexual advances, she, too, was permitted to arrive and leave work as she pleased, but when she rejected him, he would take said privilege away and place her job performance under strict scrutiny. (ASMF ¶ 36); Marlene Allen Decl, ECF 117-1, ¶¶ 9, 11, 13.) There is more.

Ms. Carter testified that, during the 2000-2011 period, she explained to Mr. Howard that she needed to make more money as a single parent, with children. He found her a new position, but then started ramping up his sexual harassment and

demands for sex even more; he likewise did the same after helping her son with a criminal arrest problem, and after this help, and that promotion, Ms. Carter gave into sex with him. (ASMF ¶¶ 45, 46, 47); (PSMF ¶¶ 11, 12, 14); (Ex. 1, ECF 120-1Carter Decl); (see also Strickland, 692 F. 3d 1151, 1160. In fact, and additionally, even when Howard suspended Ms. Carter, in 2011, for an incident at the workplace he still pursued her for sex while she was suspended and after she came back. (Carter Decl. ¶¶ 6, 7.) ; (PRSMF ¶¶ 18, 21.); (Ex.1, ECF 120-1, Carter Decl. ¶ 6.) Ms. Carter retired that year.

Relevantly, taking action against Ms. Carter while still pressing even harder for sex was a common tactic of Howard. For example, after Ms. Carter's mother died in 2017, and she cut Howard off in late November 2017, and then she tried to take FMLA, Howard became upset. (ASMF ¶ 37) (ECF 116-2, ¶ 10, Declaration of Tisa Grimes, about Howard being upset); (PRSMF ¶ 62.) Having no choice but to allow for the entitled FMLA, Howard sent a letter personally signed by him, demonstrating that Ms. Carter had exceeded her annual entitled leave by about 230 hours, **as if he had no idea**; then, when Ms. Carter came back from FMLA, in late May 2018, Howard stripped her of her supervisory capacities, took her out of her office, and placed her in a hallway cubicle. (ASMF ¶ 40); (PRSMF ¶ 64). Here is what's so important about that: After punishing Ms. Carter, Howard began

pressuring her for more sex and sexually harassing her, evidenced by—especially under the applicable standard of review—Howard is caught on an audio recording stating "I keep asking you [for your pussy] and you keep playing with me"—with emphasis on "I keep asking," as in Howard had been continually asking for sex prior to that recorded statement in August 2018. (ASMF ¶¶ 39, 40, 41); (PRSMF ¶¶ 65, 66.)

In fact, the 2011 suspension and the stripping of Ms. Carter's supervisory capacities and tossing her into a hallway cubicle were always accompanied by pressure for sex, and when Ms. Carter is heard on an audio recoding telling Howard that he treats her mean in the office, he simply replied by stating that he has to do that to keep people "off of her," Ms. Carter. (ASMF ¶ 34) (PRSMF ¶¶ 66) . There is more.

Ms. Carter testified that after continual sexual requests and being mean to her in the office, she gave in again and had sex with Howard in November 2018. (PRSMF ¶¶ 80, 82.) But, then she cut him off starting around December 2018. Id. Stopping right here, the evidence relevantly shows that Ms. Gloria Robinson saw Howard kissing Iyana Young on the lips in a sexual manner, and that "while also working for and under Paul Howard, I [Gloria Robinson] saw a lot of what I consider, inappropriate behavior, by Paul Howard towards women in the Fulton

County District Attorney's Office such as touching [and] saying inappropriate thing." (ECF 117-3.) With this in mind, in November when Ms. Carter told Howard, no more, cutting him off—Iyanna Young received a blistering disciplinary letter—dated November 16, 2018—from Paul Howard's chief of staff Lynne Nelson, placing Ms. Young on 14 days of retraining and six months' probation, with the possibility of immediate termination by Paul Howard. (ASMF ¶¶ 22, 23, 25.)

Just 12 days after said letter, having not even completed her re-training, Howard sent Ms. Young a letter, dated November 28, 2018. In this letter, he mysteriously tells Ms. Young that her work performance has been outstanding, and Howard gives Ms. Young a new position as his "executive assistant" (Ms. Carter started off as his secretary too), with a raise—and then tells her she reports directly to him, effectively eliminating her disciplinary re-training and probation. (ASMF ¶¶ 20, 21, 22, 23, 24, 25) **Howard added another woman to his harassment entourage**, and everyone knew it. (See Robinson Decl. ECF 117-3 ¶¶ 5, 6.)  Without coincidence, Ms. Young avoided service in this case, essentially refusing to be deposed under oath.

With that in mind, having cut Howard off again, in December 2018, Ms. Carter found herself in a predicament at the Fulton County Courthouse because they had implemented a new zero tolerance gun policy, and Ms. Carter forgot to take her

legally permitted gun out of her purse. (PRSMF ¶¶ 72, 80, 82)  Carter called her boss Howard, who took care of the situation immediately in a manner not accorded to other similar employees caught by surprise regarding the new policy. (PRSMF ¶ 80) And, then Howard began sexually harassing Ms. Carter again, including pressuring her for sex. (ASMF ¶ 43); (PSMF ¶ 80); (ECF 120-1, Carter Decl ¶.) This time Ms. Carter said no each time. Id. As of no surprise, having already stripped her supervisory capacities and shoving her into a hallway cubicle, this time Howard put Ms. Carter on probation, **using a vulnerability he created through providing her a special privilege that he could easily take away and use against her at any time**. (PRSMF ¶ 17); (ECF 116-3.)[1]

He again sent Ms. Carter a letter, stating that she was "late 47 times, 2 unexcused absence and 7 instances where your whereabouts were unknow since you did not sign in." Id. After putting her on probation, Howard again kept sexually harassing Ms. Carter, including pressing her for sex and sexual favors; each time she said no. (ECF 120-1 Carter Decl.) Then came the firearm incident at the gas station, which Howard never investigated; claims he consider the previous arrest he did not care at all about the January arrest in 2019 as evidenced by Ms. Carter never being

---

[1] Howard chose to let women come and go as they pleased because as soon as he felt rejected by those women, he had an instant reason to harass them about their work performance: absenteeism and punctuality, although Howard knew he induced absenteeism and punctuality issues by granting the privilege to each woman of coming and going as they pleased.

disciplined and Howard pursing sex immediately after her helped Ms. Carter. Additionally, Howard testified that the only thing he used to make his determination was an incident report given to him by his investigator, but then he submits an affidavit with additional reasons and claims in his statement of facts that Ms. Carter had a history of gun violence, a bogus claim that is unsupported by any facts. Truth is, he had Ms. Carter's belongings packed up in a box and dropped off at her door, unceremoniously, never speaking to her about the incident one time, because she rejected permanently his sexual advance/misconduct, or at least a reasonable jury could conclude as much. (ASMF ¶¶ 1-47); (See PRSMF ¶¶ 4, 10, 11, 12, 15, 16, 17, 44, 74-82); (See Howard Dep, ECF 119, 93:1-6.)

Based on the facts above, a reasonable jury could easily conclude that Howard "unreasonably interfere[d] with an employee's [Ms. Carter's] job performance by creating a hostile, intimidating, or offensive work environment." Baines, 2020 U.S. Dist. LEXIS at *13. Moreover a reasonable jury could easily conclude that, Howard did not care at all about the incident in June 2019, or the January 2019 incident, and knows full well Ms. Carter did not have a history of gun violence; instead, Howard had been cut off, had other women in the office to sexually harass, and thus used that June 2019 incident as a pre-textual opportunity to terminate Ms. Carter's employment. That said, to skirt this these realistic outcomes, Howard claims he

should win because Ms. Carter did not avail herself of the internal complaint procedure. Howard is wrong.

As stated, and relevantly, in the context of a respondent superior claim for sexual harassment, "when no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule. Civ. Proc. 8(c). *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08, 118 S. Ct. 2275, 2293 (1998). This "defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise…." No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

Here, this is not a respondent superior claim. Also, Howard loses this argument because Howard **never** "exercised reasonable care to prevent and correct promptly any sexually harassing behavior"; instead, and to the compete opposite, he continued sexually harassing Ms. Carter, and bullying her, for nearly 20 years, all the way up to her termination. Id. Furthermore, this defense applies to claims that

require a plaintiff to prove a tangible employment action, and thus this defense does not apply to Ms. Carter's hostile work environment claim, which does not require a tangible employment action. <u>Baines</u>, 2020 U.S. Dist. LEXIS at *13.

Next up, is Defendant's misleading section, in which Howard stoops really low, claiming Ms. Carter wanted him to sexually harass her. (See Def's Br. 108-1, pp. 13-14.) One absurd statement in this section of Defendant's brief is "Plaintiff testified that she had sex with Howard at last 30 times between 2016 and 2018." (Se Def's Br. 108-1, p. 14.) **The fact that Defendant would even cite this statement is bizarre because Howard claims he never had sex with Ms. Carter while he was district attorney**. (ASMF ¶ 28.) Nevertheless, Ms. Carter testified that from the start she always told Howard "no." (PRSMF ¶¶ 9, 12, showing Carter always said no but felt she would eventually give in to Howard's tactics). Furthermore, we have a recording, which supports Ms. Carter's testimony that she routinely tried to avoid Howard; Howard is clearly heard stating that he keeps asking Ms. Carter for some pussy but she kept playing with him. (ASMF ¶¶ 40, 41) (See Carter Dep. 41:13-42:5); (see also <u>Strickland v. Norfolk Southern RY</u>, 692 F. 3d at 1160 (reasoning that "while some testimony may be subject to credibility determinations, such credibility determination are for the fact finder, which in this case is the jury.") **A jury must decide this issue**. <u>Id</u>. Plus, if Ms. Carter is to be believed, employment

actions such as throwing her in a hallway cubicle, placing her on probation, stripping her of her supervisory capacities, and terminating her job only occurred when she said "no," a reality that further supports that she routinely tried to stop these unwanted sexual advances with a verity of tactics. (**Compare** PRSMF ¶¶ 9, 12, **with** Tolan, 572 U.S. at 660, **with** (ASMF ¶¶ 40, 41), **with** Strickland v. Norfolk Southern RY, 692 F. 3d at 1160.)

Next up, Defendant is wrong again about his statement that acts before 2014 should not be considered because, according to Defendant, the causation chain is broke. (See Def's Br., ECF 108-1, p. 9.) Defendant misses the point. Legally speaking, the Supreme Court; the Eleventh Circuit Court; and sister courts have all reasoned that a Plaintiff may use prior "untimely discriminatory acts" to bridge the gap between (1) alleged unlawful discrimination and (2) retaliatory conduct that occurred years later. Cf. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 102 (2002); Cf. Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1291–92 (11th Cir. 2000). (Emphasis added); Cf. Scott v. City of Sioux City, Iowa, 68 F. Supp. 3d 1022, 1039 (N.D. Iowa 2014).

The Supreme Court, in Morgan, reasoned that when a Plaintiff files a Complaint based on a timely discrimination charge pursuant to Title VII, the law

permits that Plaintiff to "use prior acts as background evidence to support a timely claim." Specifically, the <u>Morgan</u> Court stated:

> First, discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Because each discrete act starts a new clock for filing charges alleging that act, the charge must be filed within the 180– or 300–day period after the act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence to support a timely claim. In addition, the time period for filing a charge remains subject to application of equitable doctrines such as waiver, estoppel, and tolling.
> [Id.]

The Eleventh Circuit Court of Appeals has undertaken similar reasoning, stating—in the context of a four-year gap in time between the alleged protected activity and unlawful retaliation—that "gaps of time, standing alone, do not preclude [a plaintiff] from producing enough evidence for a reasonable jury to conclude that protected speech was a substantial factor in the decision to terminate him… [a]lthough the gaps of time in these cases were significantly shorter than the four year gap here, Stanley is not precluded from producing other evidence to establish causation." <u>Stanley v. City of Dalton</u>, Ga., 219 F.3d 1280, 1291–92 (11th Cir. 2000). (Emphasis added.)

Additionally, one of our sister courts has adopted similar reasoning about bridging the gap between a complaint of discrimination and retaliatory conduct that

occurred years later:

> I conclude, further, that this evidence and other evidence is sufficient to generate genuine issues of material fact on retaliation, despite the long period of time between the protected activity in 2004 and the allegedly retaliatory conduct in 2012, although such a long time period might ordinarily break any causal connection. This is so, because this and other evidence suggests that Eckert's allegedly retaliatory animus was still very much alive in 2012. Indeed, as the Eighth Circuit Court of Appeals has pointed out, under Morgan, untimely discriminatory acts may constitute relevant "background evidence in support of a timely claim." Saulsberry v. St. Mary's Univ. of Minnesota, 318 F.3d 862, 866 (8th Cir. 2003) (citing Morgan, 536 U.S. at 113, 122 S.Ct. 2061). Although the untimely actions that Scott argued were part of a continuing violation are not actionable, they are evidence that helps to bridge the causation "gap" between a complaint of sexual harassment in 2004 and an allegedly retaliatory action in 2012. [Scott v. City of Sioux City, Iowa, 68 F. Supp. 3d 1022, 1039 (N.D. Iowa 2014).]

Here, in similar fashion, Ms. Carter simply uses past conduct to demonstrate that nothing changed when she came back to work in 2014 and contrary o stating that the acts committed caused what happened in 2019—Ms. Carter is using these acts to support the allegation of a continuous hostile work environment and quid pro quo system that was always present so long as she was a subordinate employee of Howard. Morgan, 536 U.S. at 102.

Finally, Defendant egregiously writes an entire section about bankruptcy, making statements such as "Plaintiff testified that her claims existed in 2000," and "Plaintiff's failure to disclose the potential claim was not inadvertent," and "Plaintiff claims she knew of her alleged claims while her bankruptcy was pending and she

had a motive to make inconsistent statements—namely, if she did not disclose the claims to the bankruptcy court, she could keep all the proceeds if she won her suit." (Def's Br. P. 12.) First, it is not clear if Howard is referring to his cited case law or Ms. Carter. In any event, and as sated, Howard never cites Ms. Carter's testimony, or any other evidence, to support his argument. Id. Nevertheless Ms. Carter testified that she did not have any claims to disclose in 2015, that she did not believe she had any claims in 2015, and this testimony leaves little wonder as to what Howard did not cite to it. (PRSMF ¶¶ 40, 41.)

## CONCLUSION

Wherefore, Defendant's Motion should be denied in its entirety.

Respectfully submitted this 13th day of December 2022.

/s/ Mario B. Williams
Mario B. Williams
Ga. Bar No. 235254

**HDR LLC**
44 Broad Street NW, Suite 200
Atlanta, GA 30303
(404) 254-0442/(404) 577-0080 FAX
mwilliams@hdrattorneys.com

/s/David E. Betts
David E. Betts
Ga. Bar No. 055850

**BETTS & ASSOCIATES**
44 Broad Street NW, Suite 200
Atlanta, GA 30303
(404) 254-0442
davidbetts@bettslaw.net

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **CATHY CARTER**, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Civil Action No.: |
| | ) 1:20-cv-01674-TWT-JSA |
| | ) |
| **PAUL HOWARD, in his individual** | ) |
| **and official capacity,** | ) |
| | ) |
| *Defendant*. | ) |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day I served the foregoing PLAINTIFF'S

RESPONSE TO DEFENDANTS AMENDED MOTION FOR SUMMARY

JUDGMENT to all counsel of record via email.

Respectfully submitted this 13th day of December 2022.

<u>/s/ Mario B. Williams</u>
Mario B. Williams
Ga. Bar No. 235254

**HDR LLC**
44 Broad Street NW, Suite 200
Atlanta, GA 30303
(404) 254-0442/(404) 577-0080 FAX
mwilliams@hdrattorneys.com